**AB IRO and Wesco Division of Torrington Company, Plaintiffs,**

v.

**OTEX, INC. and Roj Electrotex, s.p.a., Defendants.**

Civ. A. No. 77–2114–0.

United States District Court,
D. South Carolina,
Greenville Division.

April 18, 1983.

---

Clinch H. Belser, Jr., Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., Richard G. Lione, Hume, Clement, Brinks, Willian & Olds, Ltd., Chicago, Ill., for plaintiffs.

Ralph Bailey and Cort R. Flint, Bailey, Dority & Flint, Greenville, S.C., for defendants.

William C. Hubbard, John L. Choate, Nelson, Mullins, Grier & Scarborough, Columbia, S.C., Francis J. Murphy, John M. Calimafde, Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, for involuntary plaintiff Wesco.

## ORDER

MATTHEW J. PERRY, Jr., District Judge.

Plaintiff AB Iro (hereinafter Iro), a corporation of Sweden, is the owner by assign-

ment (Plaintiffs' Exhibit 3) of United States Patent No. 3,796,386 (P. Exh. 1), which issued on March 12, 1974, to Karl Tannert, a citizen of West Germany. Iro brought this action against Otex, Inc. (hereinafter Otex), a corporation of South Carolina, and Roj Electrotex s.p.a., (hereinafter Roj), a corporation of Italy, for infringement of the Tannert patent. Plaintiff Iro initiated this action in October, 1977. Subsequently, Roj and Otex filed a counterclaim against Iro and Iro's United States distributor, Wesco Division of the Torrington Company (hereinafter Wesco), alleging numerous antitrust violations. Wesco was joined in the action as an involuntary plaintiff. Trial was held on December 3 through 7, 1979. Subsequently, the Court has received from all parties voluminous briefs arguing the various positions.

The contentions of the parties can be grouped under three general headings: (1) Defendants' claims that the Tannert patent is invalid because of obviousness; (2) Plaintiffs' claims that the defendants, by manufacturing and marketing the West 840 and West 1000 model yarn feeders, have infringed the Tannert patent, U.S. Patent 3,796,386; and (3) defendants' counterclaims that the plaintiffs by bringing their action, have violated sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2. In like manner, this opinion consists of three parts, the first addressing the question of obviousness, the second dealing with infringement, and a third dealing with the antitrust counterclaim.

## I.

## VALIDITY OF THE TANNERT PATENT

At the outset, I confess no expertise in the field of patent law, and further acknowledge that this is an area which demands considerable expertise. In order to make my course of reasoning clear, I will include matters which patent experts may consider obvious. The disdain of the experts notwithstanding, I prefer the cautious course of reciting the obvious, in the hope of resolving the complex questions this case raises.

To begin, the Tannert patent, U.S. Patent 3,796,386, the subject of this case, is embodied in a documentary exhibit, plaintiffs' Exhibit 1, which consists of 18 sheets, contained fifteen intimidatingly technical drawings, or "figures," followed by a 22-column written explanation of the invention. Beginning at column 16, line 48 are 41 Claims of the patent, that is, to quote the jargon of the exhibit "what it is desired to secure by Letters Patent of the United States."

It is the plaintiffs' contention that the West 840 and West 1000 yarn feeders infringe Claims 1, 9, 10, 11, 12, 28 and 39 of the Tannert patent. Defending against this claim, the defendants press two arguments: obviousness and noninfringement.

In order to explain these claims and defenses, it is necessary that I undertake an admittedly lengthy discussion of yarn feeders and patents.

## A. THE DISCLOSURE OF THE TANNERT PATENT.

The specification and drawings of the Tannert patent (P. Exh. 1) disclose a "Thread Feeder for Textile Machines." The specification of the Tannert patent at col. 1, lines 10–25 describes the type of thread feeders which the inventions of the patent in suit comprise. Such thread feeders are described as devices which are disposed between a thread storage spool (or the like) and an operating point of a textile weaving or knitting machine. Such thread feeders have a coiling or winding body, sometimes referred to as a drum. The feeder withdraws thread from the storage spool and coils, that is, winds the thread onto the stationary winding body. The feeder includes means for moving the thread coils along the length of the winding body. The textile weaving machine takes thread from the winding body as it needs thread by pulling it off overhead; i.e., over one end of the winding body. With a weaving machine, the thread is withdrawn by the weaving machine in a rapidly varying

pattern alternatingly withdrawing thread and not withdrawing thread.

As the specification points out, such apparatus is generally known and the primary purpose of it is to eliminate variations and fluctuations in tension caused by different factors such as thread size, coil size, and the like. The end result is to enable the textile machine to receive thread at a continuous, although not necessarily constant, rate without problems occasioned by tension variation, thread breakage, and depletion of the storage spool of thread. For example, when a storage spool has been emptied a sensing device turns the textile machine off. There is a normal momentary delay until the machine actually stops. The presence of a number of thread turns in the coil store on the thread feeder during this momentary delay enables the textile machine to continue for that moment without damaged fabric being produced.

Conventionally the thread is initially taken from the supply package by a rotating element on the thread feeder. In one basic variation of prior art thread feeders (rotating drum feeders) the winding body is the rotating element. It rotates and, in effect, wraps itself in a coil of thread withdrawn from the thread source.

An alternative basic variation of prior art thread feeders utilizes a non-rotating winding body and a rotating arm or cage encircling the winding body. In this prior art device it is the rotating arm or cage which withdraws thread from the storage spool and coils it onto the winding body.

In either case the coil turns are laid onto the winding body at one end of the body in a fixed location relative to the axis of the body and then are moved down the body toward its other end, as more thread turns are added. As the Tannert specification points out at col. 1, lines 21–25 (P.Exh. 1), thread feeders are conventionally provided with some means for axially displacing the coil progressively along the winding body.

Thread is then pulled off "overhead", i.e., "over . . . (the other) end" of the winding body by the weaving machine as it uses thread, as pointed out at col. 1, lines 24–25,

of the specification (P.Exh. 1). As it does so the coil store on the winding body is depleted from that end. As is necessary, means are provided to start the coiling operation each time the coil store is depleted to a certain minimum length along the winding body and stop the coiling operation again when the coil store reaches a certain maximum length along the winding body. By the very nature of the thread feeder construction thought necessary for many years, regardless of whether a rotating or non-rotating drum was employed, it was impossible to employ simple and inexpensive, yet accurate and maintenance free, internal thread coil store length measuring devices.

The Tannert patent thread feeder invention eliminates the problems inherent in rotating body feeders by employing a non-rotating body. It also eliminates the problems of complexity, expense, and lack of reliability which was thought to be inherent in non-rotating bodies, as the Tannert patent specification points out at col. 1, lines 51–53 (P.Exh. 1).

The specification of the Tannert patent points out at col. 1, lines 54–67 (P.Exh. 1), that the solution is achieved by assembling thread feeder in a way not contemplated before. First, the coiling body was rigidly mounted on the chassis of the thread feeder so that no complex magnet or weight imbalance system or the like had to be employed to keep the winding body stationary. A stationary drum allowed the use of a simple coil-store length sensing device, a simple mechanical feeler, for example, having a direct connection, without rotating contacts, to the power source for driving a thread laying guide. The rotating thread laying guide was moved to the opposite end of the winding body from that which the prior art had taught; i.e., the end of the winding body toward the weaving machine rather than the end facing the thread storage spool. Thread was then run from the thread storage spool through the center of the winding body and radially outwardly to the thread laying guide (as shown as Embodiment A, pictured below in figure 1,

taken from the Tannert patent file, P.Exh. 1), or through a cage-like extension or arm of the thread laying guide and then radially inwardly to the winding body (as shown as Embodiment B, pictured below in figure 2, taken from P.Exh. 1). Thread would then be layed onto the coiling body at the end opposite the storage spool from which it was being withdrawn and would progressively move axially along the winding body toward the end facing the thread storage spool. From this other end the thread would be stripped axially off the winding body in the manner of a spin casting reel paying out fishing line. In embodiment A this stripping would take place axially back in the direction of the one end of the winding body or drum directly toward the weaving machine operating point. In embodiment B the thread is stripped axially away from the smaller end of the winding body, the direction of travel would then reverse and the thread would go axially through the fixed winding body toward the weaving machine. (As in embodiment A, the thread travels through the shaft moving away from the source, toward the weaving machine; the coil store travels away from the weaving machine and toward the thread source).

The specification of the Tannert patent goes on to explain at col. 2, lines 1–9, that the use of either of embodiment A or embodiment B thread feeders, with a winding body or drum rigidly and stationarily mounted on the thread feeder chassis, permits using a simple and inexpensive, yet positively acting and reliable, control means for the coil laying drive wherein the control means operates the thread laying guide as a function of the length of the coil store. The advance noted here is the simplicity, low cost, and reliability of a system which controls thread coiling by sensing the length of the coil store. Such systems in more complex form had been available in the prior art as the specification acknowledges at col. 1, lines 45–47.

The specification then summarizes at col. 2, lines 15–39, by describing the generic combination of the thread feeder invented by Tannert in broad terms under the heading SUMMARY OF THE INVENTION. A thread feeder combination is provided, as indicated at col. 2, lines 15–22 of the specification. Its winding body is stationary and coils wound on the body are shifted axially along it, as pointed out at col. 2, lines 22–27, the stationary body permits of the use of a simple sensing means to control the amount of thread coiled on the body, as pointed out at col. 2, lines 28–33. To achieve the stationary body the thread passes through the axial center of the winding body in a direction opposite the coil movement along the body, as further pointed out at col. 2, lines 33–38.

Figures 1 and 2 show the two basic embodiments of the Tannert patent. In some ways, these are two very different devices: the thread paths are, in effect, the reverse of each other. In Embodiment A (figure 1), the thread (101–101–a) travels through the center shaft, moving from left to right in the figure, is wound onto the tapered surface (21), with the coils of thread gradually pushing one another along the drum (2) from the right back to the left. The thread is then stripped off the outside of the machine. In Embodiment B, the thread (101) is brought to the tapered surface (21) on the outside of the machine. As in Embodiment A, however, the coils again move from right to left, that is opposite the initial direction of the thread path. When the thread coils are stripped off the drum, the thread is pulled through the center shaft.

Although the two Embodiments are different, the claims of the Tannert patent— that is, those features which Karl Tannert, and now plaintiff Iro as his assignee, (See Assignment of U.S. Patent 3,796,386, from Karl Tannert to AB Iro, 11 July 1977, P.Exh. 3) contend are the patented invention—apply equally to both Embodiments. Further, the comparison of these claims to the feature of the West 840 and West 1000 thread feeders show that these machines combine features found in Embodiment B and in a variation of Embodiment A (Embodiment A2). It is therefore necessary to discuss the features found in each of the basic embodiments.

Embodiment A of the storage feeder invention claimed is illustrated in Figure 1 and described in col. 4, line 22—col. 6, line 63, of the specification. At col. 4, lines 22–30, the specification states that the feeder comprises a housing (1) illustrated in sectional view which is mounted on a weaving machine, the weaving machine itself not being shown. The feeder is designed to take thread from a storage spool 100 and transmit that thread to a weaving machine to the right of the feeder in Figure 1.

At col. 4, lines 30–41, there is described cylindrical thread winding body (2) secured to the housing (1). At its right end the winding body (2) has an integrally formed, tapered thread feed lip (21). The winding body (2) has a hollow bore extending axially through it from end to end and hollow shaft (3) is rotatable in that bore. The shaft has a drive pulley (4) secured to its drive (left) end and a thread feed rotor (5) secured to its head (right) end. The drive pulley, and with it the shaft (3), is rotated by a belt (41) from a suitable belt drive (411), a conventional electric motor.

At col. 4, lines 42—col. 5, line 2, the specification describes the rotor (5) which serves to wind the thread onto the winding body (2). The rotor includes a hub (unnumbered) on the shaft. A thin conical disk (unnumbered) extends radially outwardly of the hub and terminates in an annular hood (51). The annular edge of the hood on the left in Figure 1 is turned radially inwardly so that it covers at least a portion of the tapered thread feed guide (21) on the winding body (2). The hood has a thread winding eye (52) mounted on it. The conical disk (unnumbered) of the rotor is radially slotted (in the plane of the drawing as seen in Figure 1) so that a thread reversing idler wheel (50) and its support (unnumbered) can be mounted on the rotor as illustrated. In operation of the feeder the thread comes through the shaft (3), out of its right end, and passes over the idler wheel (50), whereupon the thread is fed through the winding eye (52) and is laid down on the tapered feed guide (21). The hood (51) and its contents, the guide wheel, are covered by a cap 53 frictionally seated

into the hood. The cap (53) serves, in effect, to enclose the head end of the feeder itself.

At col. 5, lines 3–22, of the specification a simple and inexpensive feed control mechanism possible for the first time in a non-rotating winding body feeder is described in general terms. It is mounted in a recess (22) in the winding body (2), the recess extending radially of the winding body along a substantial portion of its axial length in the plane of the drawing. In operation of the feeder, as the coil of thread builds upon the winding body (2), the coil begins to cover this recess from right to left in Figure 1. Adjacent to recess, in the feeder housing, a radial slot (unnumbered) is formed. Mounted in this slot for pivoting movement in the plane of the drawing on a pin (8) is a simple wire lever having two arms (71 and 72). One arm (71) extends into the recess while the other arm (72) remains in the radial slot formed in the housing. The second arm (72) carries a permanent magnet (73°) on its free end and a small magnet operated electrical switch (6) is mounted in the housing 1 slot with electrical leads (61 and 62) extending therefrom to the belt drive mechanism 411. The switch (6) then controls the drive mechanism (411) in response to action of the lever arms (71 and 72), which action is, in turn, controlled by the number of thread coils which accumulate on the winding body or drum (2).

At col. 5, lines 23–48 (P.Exh. 1), the operation of the sensing lever (71/72) is discussed in greater detail. The lever arm (71) engages the thread coil (102) from beneath in the recess (22) and, when just a few thread coil turns are present, the arm (71) is in its solid line position, as is the lever arm (72). At this time the lever arm (72) is up against the stop (unnumbered) in the housing (1) slot immediately adjacent to switch (6) and the switch is closed, as is conventional with magnetic switches under the effect of a magnetic field (from the permanent magnet) (73°) on the lever arm (72). With the switch closed, the belt drive (411) is energized and rotates the rotor (5) to feed

thread onto the winding body (2). As the rotor lays more coil turns on the winding body the coil store advances (to the left in Figure 1) from a point 102e to a point 102a, at the latter of which it has forced the lever arm inwardly to its dotted line position. The lever arm (71) carries the lever arm (72) with it to the dotted line position, which is far enough from the switch so that the magnet is no longer effective and the switch contacts open, stopping the rotor from laying more coil turns onto the winding body.

The specification goes on at col. 5, line 49—col. 6, line 51, to describe the operation of embodiment A of the thread feeder illustrated in Figure 1. When the rotor is rotating, thread is being drawn from the spool through a thread breaking device which keeps some tension on it, and then into the shaft (3) from which the thread emerges, passes over the guide wheel (50), and then through the winding eye (52) onto the tapered feed guide (21) of the winding body. At this point the thread tension created by the rotor pulling the thread through the breaking device, coupled with the axially sliding movement (to the left in Figure 1) of the thread turns being successively formed on the tapered feed guide (21), pull the thread tighter as the coils are formed so that the coils slide down onto the cylindrical surface of the winding body. As more coils are added they force previously formed coils axially to the left in the direction W. This continues until the thread coils reach point 102a and the lever (71/72) reaches its dotted line position, finally shutting off the belt drive (411) and the thread laying operation by opening the switch when it reaches this position. With a weaving machine in operation, it is, in the meantime, pulling thread over the right end of the feeder through a thread guide (12). Its thread needs are intermittent. Accordingly, the rotor intermittently succeeds in filing the winding body with a thread coil up to a preset point (102a). When this happens the switch opens, as has been pointed out. Further use of the thread by the weaving machine depletes the thread coil 102 store. Because the magnetic switch (6) requires a relatively

large magnetic flux to close its contacts but will stay closed until the magnetic flux effective on it has been reduced to a relatively smaller amount, the switch will not close again until the lever reaches its solid line position. This is true even though in the opposite travel direction going from its solid line position to its dotted line position, when coils 102 are added to the winding body, the switch 6 will remain closed. It is the general nature of such magnetic switches. In practice this speed at which the rotor 5 can lay coils on the winding body 2 is slightly greater than the speed at which the weaving machine can trip them off so that the feeder can never be completely stripped of coils.

The specification goes on in col. 6, line 64—col. 7, line 67 (P.Exh. 1), to describe the embodiment of the invention illustrated in Figure 2 and designated B1 herein for ease of reference. As the specification points out this embodiment B1 differs essentially from embodiment A1 of the feeder in the direction of thread travel through the center of the apparatus. In contrast to embodiment A1 of the winding body 2 of the embodiment B1 is on the left end and the drive pulley 4 is on the right end, as seen in Figure 2. The thread passes through the winding body after departing the coil store rather than before reaching the coil store on the winding body, as in embodiment A1.

As described in col. 7, lines 3–17 (P.Exh. 1), the construction of embodiment B1 provides for the feeder housing and the winding body to be secured together by pins (one of them shown, unnumbered) and to have aligned central axis passageways which form a coextensive thread guide way. To the right of the winding body a pulley is journaled on the housing and a belt (41) drives the pulley. The pulley mounts on L-shaped thread laying arm (45) which extends axially along the winding body and rotates around the winding body. Thread guide eyes (111 and 112) are formed on the arm (45).

In col. 7, lines 19–36 (P.Exh. 1), of the specification, thread (101) travel from the storage spool onto the winding body is de-

scribed. The thread passes through the thread eyes (111 and 112) on the rotating arm. The rotating thread eye (112) is located so that as the thread emerges, it is laid directly on the tapered thread feed guide surface at the right end of the spool. Like embodiment A1 of the feeder, turns of thread constrict and slide down the tapered surface to the cylindrical surface of the winding body where they form the coil store which moves to the left in the direction W. In this feeder embodiment B1 thread from the coil store is stripped; i.e., pulled axially in the manner of a spin casting reel, off the left hand end of the winding body over the bead-like edge (23). The drawing illustrates such a bead or bead-like surface as to rounded surface which guides the thread from the coil store over the left end of the winding body into the passage (3A), as illustrated, lifting the thread radially off the winding body surface. The thread (now numbered 101a), passes out of the guide way (3A) in the direction F (to the right) to the weaving machine.

Specification at col. 7, lines 37–67, describes the control of the thread feeder embodiment B1 by the switch (83). The switch is operated by a two arm wire lever (74/75) mounted on a pin in a radial recess in the winding body (in the plane of the drawing). The switch is connected by electrical leads (84 and 85) to the belt drive for the belt. The lever is mounted so that when just a few coils of thread are on the winding body surface, as shown in Figure 2, the switch arm (75) permits the switch (83) contacts to remain closed. The switch contacts are spring biased to their closed positions so that as the coil of thread moves to the left on the winding body the lever arm is forced inwardly but is not effective to cause the lever arm (73) to exert enough pressure on the switch (83) contacts to open them until a substantial number of thread coil turns have been laid on the winding body. When such a substantial number of coil turns are laid on the winding body the switch opens and belt drive stops, stopping the laying on of thread turns. As thread is then stripped from the winding body in the manner previously described, the coil store is depleted and the lever permits the switch 83 contacts to close again. The feeder starts once more to accumulate thread.

The remaining five thread feeder variations illustrated in Figures 3–15 are all variations of either embodiment A or embodiment B. They all differ principally from two basic embodiments in that, in addition to the tapered feed guide lip of these basic embodiments, the other variations employ positive acting feed devices for moving the thread coils axially along the winding body and those "active" feed devices are coupled to the drive which rotates the thread laying guide. Only one of the infringed claims, Claim 12, is concerned with such an axial positive feed device and then only in the broadest terms; i.e., it calls for "a positive axial feed device coupled with said means for driving the . . . thread laying guide." As such, only one variation of the principal embodiments, that is embodiment A2 illustrated in Figures 3–8 and described at col. 9, line 1—col. 12, line 41, of the specification is discussed, since it provides all the support required in the disclosure for the subject matter of Claim 12.

Col. 9, line 1—col. 10, line 41, describes the thread feeder A2 as it is illustrated schematically in Figures 3–5. Col. 10, line 42—col. 12, line 41, goes into details of the actual structure and its operation is illustrated in Figures 6–8.

The winding body in embodiment A2 is made up of a plurality of circumferentially arranged rods 24 mounted on and extending parallel to each other away from the thread feeder housing. These rods in effect comprise the thread winding body, as pointed out at col. 10, lines 44–57. As in embodiment A1, a shaft (3) extends through the housing is rotated by a pulley at one end (left), and rotates a rotor carrying a thread laying guide (52) at its opposite end. This is pointed out in col. 10, lines 58–65.

In col. 10, line 66—col. 11, line 47, an inner cylindrical feed roll member (13) is described as being mounted within the hollow body formed by the rods. The feed roll (13) is mounted on the shaft (3) through an

eccentric shaft section (30). The feed roll 13 is essentially a solid member but has a plurality of radially extending, axially parallel ribs (130) which are designed to protrude outwardly through and between the rods of the winding body. On the shaft the eccentric shaft section (30) is arranged so that the axis of the body, and angularly skewed from that axis at an angle. As a result, when the shaft rotates to lay thread on the body defined by the rods the cage does not actually rotate but moves in a planetary and wobbling manner, with its outwardly extending ribs penetrating between the intersticies of the rods in interdigitating fashion; i.e., each rib moves radially outward of a bracketing pair of rods and then radially inwardly thereof as the feed roll moves in planetary fashion within the body. In its planetary movement, which embodies radially outward movement and wobbling movement relative to the axis of the feeder, the feed roll lifts the coil turns of thread from one location on the rods, moves them axially off the rods, and deposits them back on the rods at a distance determined by the amount of eccentricity of the bearing axis relative to the shaft axis and the angle of eccentricity of the bearing axis to the shaft axis.

This complex technical material is the disclosure of the Tannert patent, and it sets forth what the plaintiffs contend is Mr. Tannert's invention. With this disclosure in mind, I turn to the one issue in this case which presents a close legal question: is the Tannert invention obvious in light of prior art? Many of the other questions in this case, although factually complex largely present problems of deciphering great blocks of technical material with which the Court has no prior experience. Once the pattern amid the technical complexities was finally discerned, the legal questions were easily resolved. The issue of the validity of the Tannert patent is of a different sort. The factual and technical questions are difficult enough, but more, the underlying legal question is far closer than the questions presented elsewhere in this case, of which are factually complex but legally clear cut.

## B. ADEQUACY OF DISCLOSURE IN THE TANNERT PATENT.

As a preliminary matter, the defendants have contended that the disclosure in the original Tannert patent application was inadequate under 35 U.S.C. § 112. Although they do not press this issue in their post-trial memorandum, the Court addresses the question as a matter of caution: better the issue should be resolved than the suggestion arises that it was overlooked. It appears that the defendants' argument is that the Patent Office found the disclosure in the initial application inadequate, and that the continuation-in-part did not correct this fault, so that the Tannert patent as issued should not be considered valid.

I would note, first of all, that the inventor Tannert did not appeal the adverse determination on his initial application, but elected instead to file a continuation-in-part. Under these circumstances, no *res judicata* effect follows from the initial, adverse determination of the Patent Office. *Application of Ackerman,* 444 F.2d 1172 (Cust. & Pat.App.1971); *Application of Russell,* 439 F.2d 1228 (Cust. & Pat.App.1971); *Application of Hitchings,* 342 F.2d 80, 52 CCPA 1141 (C.C.P.A.1965). This Court is free to consider the adequacy of the disclosure of the application as a whole.

The test concerning the disclosures of a patent application is whether a skilled practitioner would find the disclosures adequate. *Application of Goodwin,* 576 F.2d 375 (Cust. & Pat.App.1978), aff'd, 599 F.2d 1060 (Cust. & Pat.App.1979); *Application of Edwards,* 568 F.2d 1349 (Cust. & Pat.App.1978); *Application of Cescon,* 474 F.2d 1331, 1335 (Cust. & Pat.App.1973); *Application of Forman,* 463 F.2d 1125 (Cust. & Pat.App.1972); *Application of Moore,* 439 F.2d 1232, 1236 (Cust. & Pat.App.1971); *Application of Feinberg,* 437 F.2d 1405 (Cust. & Pat.App.1971). During the trial, the plaintiff's expert, Mr. Chadwick, testified that the disclosures contained in the Tannert patent application were wholly adequate. (Tr. 124–25.) More significantly, the defendants' own expert, Dr. Amed

Tayebi, testified that the disclosures in the original application (P.Exh. 7) were "most definitely" adequate. (Tr. 446–47.) Given this acknowledgement by the defendants' expert, I find that the disclosures contained in the Tannert patent application was adequate to meet the requirements of 35 U.S.C. § 112.

## C. NONOBVIOUSNESS AND THE STATUTORY PRESUMPTION OF VALIDITY.

The key question in this case, as in many patent cases is whether the plaintiff's Tannert patent meets the test of nonobviousness under 35 U.S.C. § 103. The pertinent language of § 103 provides:

> A patent may not be obtained ... if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The defendants contend that the Tannert device is obvious in light of two particular prior art patents, Pfarrwaller, U.S. Patent 3,411,548 (D.Exh. 6; P.Exh. 4), and Pourtier, West German Patent DT–PS 1,191,197 (D.Exh. 5; P.Exh. 35).

The test for the determination of obviousness is set forth in *Graham v. John Deere Company,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary consideration as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter to be patented. As indicated of obviousness or nonobviousness, these inquiries may have relevancy. *Id.* at 17–18, 86 S.Ct. at 694.

■ The question of the validity of the Tannert invention does not, of course, come to this Court on a clean slate. In considering this question, this Court in essence reviews the determination of the Patent Office that the Tannert patent (P.Exh. 1) should issue. In *Graham,* the Supreme Court reiterated a principle which has been apparent throughout the history of the patent system: Primary responsibility for determining patentability rests with the Patent Office with its reservoir of experience and expertise. 383 U.S. at 18–19, 86 S.Ct. at 694. *Accord, Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1053–54 (4th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Georgia-Pacific Corp. v. United States Plywood Corp.,* 258 F.2d 124 (2d Cir.1958), *cert. denied,* 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958); *S.A.B. Industries AB v. Bendex Corp.,* 199 U.S.P.Q. 95, 102 (E.D.Va.1978).

■ This expertise has led to a presumption that an issued patent is valid, a presumption now codified in 35 U.S.C. § 282:

> A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of the other claims, dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing validity of a patent or any claim thereof shall rest on the party asserting it.

Because of this statute and long-standing judicial policy, the plaintiffs are entitled to rely on the presumption that the Tannert patent is valid. The defendants bear the burden of proving obviousness by clear and convincing evidence. *Mumm v. Decker & Sons,* 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1936); *Speed Shore Corp. v. Denda,* 605 F.2d 469, 470–71 (9th Cir.1979); *Lee Blacksmith, Inc. v. Lindsay Bros., Inc.,* 605 F.2d 341 (7th Cir.1979); *Santa Fe-Pomeroy, Inc. v. P & Z Co.,* 569 F.2d 1084, 1091 (9th Cir.1978); *Blumcraft of Pittsburgh v. Citizens & Southern National Bank,* 407 F.2d 557 (4th Cir.), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2103, 23 L.Ed.2d 747, *reh'g denied,* 396

U.S. 870, 90 S.Ct. 39, 24 L.Ed.2d 125, *reh'g denied,* 396 U.S. 949, 90 S.Ct. 369, 24 L.Ed.2d 254 (1969); *Colgate-Palmolive Co. v. Carter Products, Inc.,* 230 F.2d 855 (4th Cir.), *cert. denied,* 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59, *reh'g denied,* 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120 (1956); *Lundy Electronics & System, Inc. v. Optical Recognition Systems, Inc.,* 362 F.Supp. 130 (E.D.Va. 1973), *aff'd,* 493 F.2d 1222 (4th Cir.1974); *Esco Corp. v. Tru-Rol Co., Inc.,* 352 F.Supp. 416, 425 (D.Md.1972), *aff'd,* 489 F.2d 699 (4th Cir.1974).

In challenging this presumption, the defendants contend that the most pertinent prior art patents with respect to the Tannert patent are Pfarrwaller and Pourtier. In issuing the Tannert patent, the Patent Examiner did not cite the Pfarrwaller patent (D.Exh. 6; P.Exh. 4). The Examiner did cite the Pourtier patent (D.Exh. 5; P.Exh. 35).

■ The presumption of validity attaching to an issued patent rests on the assumption that in issuing a patent the Patent Office has considered all pertinent prior art. It is therefore well established that the presumption of validity does not attach to prior art not considered by the Patent Office. *Blohm & Voss AG v. Prudential-Grace Lines, Inc.,* 489 F.2d 231, 244 (4th Cir.1973), *cert. denied,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974); *Eisele v. St. Amour,* 423 F.2d 135, 138–39 (6th Cir.1970); *Bentley v. Sunset House Distributing Corp.,* 359 F.2d 140, 146 (9th Cir.1966); *Heyl & Patterson, Inc. v. McDowell Co.,* 317 F.2d 719 (4th Cir.1936); *Crane Packing Co. v. Spitfire Tool & Machine Co.,* 276 F.2d 271 (7th Cir.1960), *cert. denied,* 363 U.S. 820, 80 S.Ct. 1259, 4 L.Ed.2d 1517 (1960); *Sabel v. Wickes Corp.,* 345 F.Supp. 1227, 1229 (D.S. C.1971); *National Steel Corp. v. Baltimore & Ohio R.R.,* 313 F.Supp. 934, 941 (D.Md. 1970); *Uniroyal, Inc. v. Daly-Herring Co.,* 294 F.Supp. 754, 757 (E.D.N.C.1968). Relying on this rule, the defendants insist that the Tannert Patent must be considered without the benefit of any presumption in its favor because the Examiner did not cite Pfarrwaller.

The defendants have overstated the effect of the failure of the Patent Office to cite the Pfarrwaller patent in the Tannert patent. While the failure of the Patent Office to cite a single patent *may* be sufficient to defeat the presumption of validity, *Dresser Industries, Inc. v. Smith-Blair, Inc.,* 322 F.2d 878 (9th Cir.1963), the presumption does not automatically cease to exist on showing that a prior art patent was not cited by the Patent Examiner.

■ To weaken the presumption of validity which attaches to the Tannert patent, there must be some showing that pertinent prior art was not considered by the Patent Examiner, not merely that it was not cited. As the court in *Lundy Electronics & Systems, Inc. v. Optical Recognition Systems Co., Inc.,* 362 F.Supp. 130, 142 (E.D.Va. 1973), explained:

> Even though not cited as a reference by the Patent Examiner, there is no presumption in a patent infringement proceeding that patents not cited were overlooked, since they may have been considered and cast aside as not pertinent. *Davis v. Buck-Jackson Corp.,* 138 F.Supp. 908 (E.D.S.C.1955) *aff'd,* 230 F.2d 655 (4th Cir.), *cert. denied,* 351 U.S. 950 [76 S.Ct. 846, 100 L.Ed. 1474] (1956). It is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as it is to conclude that it was inadvertently overlooked. However, the question whether the failure of the Examiner to cite certain art is consistent with its examination and rejection depends on the pertinency of the uncited art. *Maschinenfabrik Rieter, A.G. v. Greenwood Mills,* 340 F.Supp. 1103 (D.S.C.1972); *Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp.,* [218 F.Supp. 1 (D.Md.1963), *aff'd,* 327 F.2d 497 (4th Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964) ].

Further, where the file wrapper of a patent indicates that the Patent Examiner searched the class and sub-class which contains the prior art cited by the party attacking the validity of a patent, it is presumed

that the Patent Examiner considered all pertinent prior art in the sub-class. *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 538 (7th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Uarco Inc. v. Moore Business Forms, Inc.*, 440 F.2d 580, 585 (7th Cir.1971); *Canaan Products, Inc. v. Edward Don & Co.*, 388 F.2d 540, 544–45 (7th Cir.1968); *Minnesota Mining & Manufacturing Co. v. Berwick Industries*, 393 F.Supp. 1230, 1234–35 (M.D.Pa.1975), *aff'd*, 532 F.2d 330 (2d Cir.1976); *Derring Milliken Research Corp. v. Beaunit Corp.*, 382 F.Supp. 403, 410 (W.D.N.C.1974), *rev'd on other grounds*, 538 F.2d 1022 (4th Cir.1976), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *Amerca Esna Corp. v. Highway Safety Devices Inc.*, 330 F.Supp. 313 (N.D.Tex.1971); *Lage v. Caldwell Manufacturing*, 221 F.Supp. 802 (D.Neb.1963).

In this instance, the Patent Examiner's search included Class 242, sub-class 47.12, the class and sub-class which contained the Pfarrwaller patent. Therefore, although the Examiner did not cite the Pfarrwaller patent, there is a strong presumption that he considered it. His reason for not citing this patent may well have been that he considered it no more pertinent than the other prior art patents which he did cite. *A. R. Inc. v. Electro-Voice, Inc.*, 311 F.2d 508 (7th Cir.1962). The Examiner's citation of Rosen suggests this is what occurred. Rosen cites Pfarrwaller (*see* P.Exh. 5).

Even assuming *arguendo* that the Examiner did not consider the Pfarrwaller patent, this alone would not void the presumption of validity which attaches to the Tannert patent. It would weaken that presumption only insofar as the Pfarrwaller patent is prior art more pertinent than the art cited and considered by the Patent Examiner. *La Salle Street Press, Inc. v. McCormick & Henderson, Inc.*, 445 F.2d 84, 93 (7th Cir.1971); *TSC Industries Inc. v. International Harvester Co.*, 406 F.2d 53, 57 (7th Cir.1968); *National Dairy Products Corp. v. Borden Co.*, 394 F.2d 887, 891 (7th Cir.), *cert. denied*, 393 U.S. 953, 89 S.Ct. 378, 21 L.Ed.2d 364 (1968); *Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc.*, 298 F.2d

765, 768 (7th Cir.), *cert. denied*, 369 U.S. 886, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962); *Brennan v. Hanger, Inc.*, 203 U.S.P.Q. 697, 702 (S.D.N.Y.1979); *Denison Mfg. v. Ben Clements & Sons, Inc.*, 203 U.S.P.Q. 895, 907 (S.D.N.Y.1979); *State Bank of Annawan v. Rendispos Corp.*, 173 U.S.P.Q. 136, 143 (S.D. Ill.1971); *Mercantile National Bank of Chicago v. Quest, Inc.*, 303 F.Supp. 926, 933 (E.D.Pa.1975); *Illinois Tool Works, Inc. v. Continental Can Co.*, 273 F.Supp. 94, 111 (N.D.Ill.1967).

In this case, the Patent Examiner did cite the Rosen U.S. Patent 3,720,384 (P.Exh. 5), and the defendants' expert, Dr. Tayebi, testified that in terms of the teaching relevant to this case, this first Rosen Patent is equivalent to the later Rosen Patent (U.S. patent 3,796,384; D.Exh. 10), and is equivalent to the Pfarrwaller patent (P.Exh. 4; D.Exh. 6) (Tr. 396, 417–18).

My own examination of the patents in question convinces me that Dr. Tayebi was correct in this view. The earlier Rosen patent (P.Exh. 5), and the later Rosen patent (D.Exh. 10) each contain five technical figures which are identical in every respect. The earlier patent adds two other figures, but these illustrate features not pertinent to this inquiry. Although there are differences between the two written abstracts of the patent, much of the language is again identical. The defendants would totally discount the significance of the earlier Rosen patent, pointing out that it was never put to a commercial use, and that it was intended for use in knitting rather than weaving applications. I find neither reason persuasive. The significance of a patent in this context is its teaching as prior art, not its commercial impact. The authorities are unanimous that commercial impact is a secondary consideration. Secondly, although knitting machines are distinct from weaving machines, the Rosen patent is unquestionably pertinent art. *Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499, 507 (5th Cir.1979).

The Pfarrwaller patent (P.Exh. 4, D.Exh. 6) is superficially different from the Rosen patents. The defendants, however, cite the

Pfarrwaller patent for only a single feature: that it teaches the control of yarn feeding onto the winding body in response to the length of the thread store on the winding body. (Tr. 359–61; Defendants' Brief at 2, 4). As Dr. Tayebi has acknowledged, the Rosen patent (P.Exh. 5) teaches the same concept. (Tr. 396).

Having carefully examined the Pfarrwaller patent and compared it with the Rosen patent cited by the Patent Examiner, I do not believe that the Pfarrwaller patent is more pertinent to the determination of the obviousness or nonobviousness than the Rosen patent is. Therefore, the presumption of validity under 35 U.S.C. § 282 is not weakened by the Patent Office's failure to cite the Pfarrwaller patent.

■■■ As noted above, the Patent Examiner did cite the Pourtier patent. Where the Patent Office has cited the prior art on which a defendant relies in challenging the validity of a patent, the presumption of validity is greatly strengthened. *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.,* 546 F.2d 530, 540 n. 28 (3d Cir.1976); *Chicago Rawhide Mfg. Co. v. Crane Packing Co.,* 523 F.2d 452, 458 (7th Cir.1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Tracor, Inc. v. Hewlett-Packard Co.,* 519 F.2d 1288, 1292 (7th Cir.1975); *Research Corporation v. Nasco Industries, Inc.,* 501 F.2d 358 (7th Cir.1974); *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 268 (2d Cir.1967); *Marston v. J.C. Penney Co.,* 353 F.2d 976, 982 (4th Cir.1965), *cert. denied,* 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); *Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc.,* 350 F.2d 885, 890 (5th Cir.1965); *Shumaker v. Gem Manufacturing Co.,* 311 F.2d 273 (7th Cir.1962); *Power Curbers, Inc. v. Etnyre & Co.,* 298 F.2d 484, 492–93 (4th Cir.1962); *Jeoffroy Manufacturing, Inc. v. Graham,* 219 F.2d 511, 519 (5th Cir.1955); *Southern States Equipment Corp. v. U.S. C.O. Power Equipment Corp.,* 209 F.2d 111, 118 (5th Cir.1955); *Dart Industries, Inc. v. E.I. du Pont de Nemours & Co.,* 348 F.Supp. 1338, 1355 (N.D.Ill.1972); *Shields-Jetco, Inc.*

*v. Torti,* 314 F.Supp. 1292, 1295 (D.R.I. 1970); *Arthur J. Schmitt Foundation v. Stockham Valves & Fittings, Inc.,* 292 F.Supp. 893, 907 (N.D.Ala.1966), *aff'd* 404 F.2d 13 (5th Cir.1968), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2177, 26 L.Ed.2d 549 (1970); *Illinois Tool Works, Inc. v. Continental Can Co.,* 273 F.Supp. 94, 111 (N.D.Ill.1967).

Thus, there is a strong presumption in this case that the Tannert patent is valid and not obvious. While the question is not foreclosed and requires an independent consideration by this Court, reasonable doubt must be resolved in favor of a finding that the plaintiffs' Tannert patent is valid. *Radio Corp. of America v. Radio Engineering Laboratories,* 293 U.S. 1, 7, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934).

### D. THE TANNERT PATENT AND ANTICIPATION, 35 U.S.C. § 102.

Although the defendants rest their attack on the validity of the Tannert patent primarily on the contention that the invention is obvious and the patent therefore invalid under 35 U.S.C. § 103, there is a sufficient contention of anticipation under 35 U.S.C. § 102 to warrant the Court's attention.

■■■ The defendants contend that, without reference to other art, the Pourtier device can be modified to achieve the patented device. (Tr. 359–61, 369; Defendants' brief at 4). Assuming *arguendo* that this contention is true, I find it is not sufficient to make out a case of anticipation as that term is construed in the cases interpreting 35 U.S.C. § 102. Anticipation is established only when a single device in the pertinent prior art includes all of the claimed elements of the invention in question. *American Original Corporation v. Jenkins Food Corp.,* 696 F.2d 1053, 1058–59 (4th Cir.1982); *Carter-Wallace, Inc. v. Gillette Co.,* 675 F.2d 10, 15 (1st Cir.1982); *Arbrook, Inc. v. American Hospital Supply Corp.,* 645 F.2d 273, 276–77 (5th Cir.1981); *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 654 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Application of Marshall,* 578 F.2d 301 (Cust. &

Pat.App.1978); *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1056 (4th Cir.1976); *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1182–83 (7th Cir.1971) and cases cited therein; *Plasser American Corporation v. Canron, Inc.*, 546 F.Supp. 589 (D.S.C.1980); *Thomas & Betts Corp. v. Winchester Electronics Division of Litton Systems, Inc.*, 519 F.Supp. 1191 (D.Del.1981); *Wycoff v. Motorola, Inc.*, 502 F.Supp. 77 (N.D.Ill.1980); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 (D.S.C.1977), *aff'd in part, rev'd in part on other grounds*, 594 F.2d 979 (4th Cir.1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980). As the defendants admit, the Pourtier device responds to the length of the coil store on the winding body by engaging and disengaging the coil removal function. In a weaving situation, this would mean that the loom would have to continually start and stop. This is impractical in a weaving situation. This alone is sufficient to defeat any claim of anticipation, and I conclude that the Tannert patent was not anticipated by the Pourtier patent, or by any other cited prior art.

### E. SCOPE AND CONTENT OF THE PRIOR ART.

The prior art patents upon which Roj and Otex rely are the Pourtier German patent No. DT 1,191,197 (P.Exh. 35, D.Exh. 5) and the Pfarrwaller U.S. patent No. 3,411,548 (P.Exh. 4, D.Exh. 6). These are described in the following pages. In addition to this, because of their equivalence to the Pfarrwaller patent, the Rosen U.S. patent No. 3,720,384 (P.Exh. 5) and the Rosen U.S. patent No. 3,796,384 (D.Exh. 10) are also described.

1. *Pourtier German Patent No. 1,191,197*

#### (P.Exhs. 35A, 35B, 36)

As described in the translation (P.Exh. 35B), the drawing (P.Exh. 36) and Mr. Chadwick's testimony (Tr. 514–18), this German patent cited by the Patent Office shows a device for feeding wire cable. It comprises a drum which is rigidly fixed to a shaft. The shaft is, in turn, rigidly mounted on the framework of the storage device.

The storage device is designed to take up and store wire cable being continuously delivered from a manufacturing process during those periods when drums are not being filled with the wire for marketing; i.e., when a drum has been filled and is being removed and an empty drum substituted for it. Viewing the storage device in the single figure of the patent drawing, the wire is received from the wire manufacturing machine at the right through a guide. It proceeds to a pulley mounted on the periphery of a rotatable disc. The disc is rotated through a drive pulley by a belt drive.

The disc rotates relative to the fixed drum. As it does so, it circumferentially lays wire in successive coils on the drum adjacent to a wobbling ring also rotated by the disc. The disc is rotated at the speed at which the wire is being manufactured so as to continuously lay it on the drum as the wire is manufactured.

The wobbling ring successively nudges each new coil to the right on the drum to make way for the next coil. In this way the coils are built upon and moved to the right along the drum. Notably, the coils move toward the source.

To remove wire from the drum a marketing spool to which the wire coming from the left end of the devices is attached, is rotated. The wire is pulled through the passage in the shaft from the right end of the shaft over a wire reversal guide. It reaches the guide by being circumferentially unwrapped from the drum over a pulley. The pulley is mounted on a radial arm of a bushing rotatable on the shaft.

Rotation of the marketing spool thus causes the arm and the pulley to rotate. Wire is circumferentially unwrapped from the drum, drawn over the pulley as the pulley rotates, and passes in the opposite direction through the shaft to the rotating spool. The spool is rotated under the control of a switch operated by two photocells and on the drum. When the coils on the drum are reduced in number to a point

where the photocells receive a sufficient light signal from the light source, the spool is stopped and wire removal ceases until sufficient coils again build up on the drum to cover the cells. During this period, a full spool may be removed and an empty spool put in its place to begin filling it when spool rotation again is called for. Wire continues to be laid on the drum at all times.

### 2. *Pfarrwaller U.S. Patent No. 3,411,548*

#### (P.Exh. 4, D.Exh. 2)

Referring to the patent and Mr. Chadwick's testimony (Tr. 63–67), the Pfarrwaller patent (*see* esp. Fig. 2) discloses a weft thread feeder for looms. The feeder takes thread from the storage bobbin and coils it on its drum. The thread is removed from these coils on the drum by a gripper shuttle. The feeder includes a supporting arm which is fixed to the loom frame. The arm mounts bearings which rotatably carry a hollow shaft.

At the left end of the shaft a pulley is loosely seated on it. A clutch plate on the pulley cooperates by magnetic coupling with a disc fixed to the shaft to cause the shaft to rotate with the pulley when the magnetic coupling is energized.

At the right end of the shaft, an eye and bore is provided through which the weft thread passes from the inside to the outside of the shaft. The shaft has affixed to its right end a hollow conical body which functions as a flyer arm. At the outer edge of the flyer arm is provided a thread feeding eye through which the weft thread is passed.

The shaft, at its right end, includes an extension inside the hollow cone. A drum is rotatably supported with respect to the shaft in this space on ball bearings. Whereas the shaft with its right end rotates, the drum is held against any substantial rotation by two permanent magnets supported within a ring which encircles the right end of the drum so as to leave an annular space between the ring and the drum. The drum carries two armatures which cooperate with the magnets to substantially prevent the drum from following the rotation of the shaft. In effect, these magnets and armatures counter-rotate the drum relative to the shaft.

The support arm additionally carries a light source whose beam is obliquely incident on the drum. The reflected beam of light impinges on a photocell which is shielded from the source by means of a mask. The photocell is connected by conductors to the switching device.

During operation of the loom, rotation of the cone continuously pulls weft thread from the bobbin through the hollow shaft and through the eye formed on the cone or flyer, and the thread so withdrawn is wound onto the drum. During each pick by the weaving shuttle, the thread unwinds from the drum under the brushes of the braking ring.

As the coils of thread are laid on the drum by the eye, they are laid on the conical enlargement of the drum. The drum has a polished surface so that the arriving coils cause those already wound to slip to the right, and thus move onto the cylindrical portion of the drum. After several revolutions have been executed by the shaft, several turns will build up on the cylindrical portion. By reason of the polished nature of the drum surface and because of the looseness with which the turns are wound, each coil will be shifted to the right by the coil to the left of it. In contrast to the Pourtier and Tannert devices, the coils in the Pfarrwaller device are shifted away from the source.

If the axial length of the space occupied by the coils of thread on the drum extends to the right so as to cover the point at which the light beam is reflected, the reflected beam will be interrupted. The photocell and a switching device are so adjusted that with this reduction of light incident on the photocell, the supply of current to the magnetic coupling is interrupted and the hollow shaft and cone come to rest.

When, after one or more additional picks, enough coils are withdrawn from the drum so as to uncover the spot at which the light beam is incident on the drum, the photocell will again receive the reflected beam so

that the magnetic coupling will be restored by operation of the photocell and the switching device will cause the cone to resume rotation with the shaft and once more with raw weft thread from the bobbin and wind it on the drum.

In a modified embodiment of the thread feeder, the drum includes an eccentric mass which causes the drum to be unbalanced. The weight of the mass hinders rotation of the drum so as to make the ring magnet and armatures unnecessary. Again, the effect is to counter-rotate the drum relative to the shaft.

3. *Rosen U.S. Patent No. 3,720,384*

(P.Exh. 5)

As shown in the patent and Mr. Chadwick's testimony (Tr. 67–71), the Rosen patent (P.Exh. 5) discloses a thread feeder also. The feeder comprises a chassis housing in which a shaft is journaled on ball bearings. The shaft has a hollow projecting arm bent downwardly at its outer end. Thread comes from a supply package through the hollow shaft and out of the arm where it is laid on the cylindrical surface of the winding body by the rotation of the shaft and arm. A pulley wheel driven by a belt is connected to the shaft and rotates it.

The winding body is mounted on the shaft also but it is held against rotation with the shaft. This is accomplished by a complicated arrangement of a gear ring fixed on the housing, a gear ring of identical size mounted on the winding body, and a pair of sprockets which run around these two rings on a pin as the shaft rotates. This planetary gear arrangement keeps the winding body stationary. As in the Pfarrwaller device the effect is one of counter-rotation.

As the arm rotates it lays thread on the stationary winding body in precisely the same location relative to the axis of the winding body with each rotation. These turns of thread are successively and progressively moved axially down the winding body by the pressure of an inclined, toothed disc. The disc is mounted on the rotating shaft with bearings so that it does not rotate. Its teeth protrude outwardly of the winding body cylindrical surface. Although the disc does not rotate with the shaft, its bearing mounting plate does so that the disc wobbles as the shaft rotates. This wobbling forces thread laid on the winding body to be forced axially down the winding body with each rotation.

The disc is actually maintained in its inclined position by the pressure of a spring. When a predetermined number of yarn coil turns have accumulated in the yarn store on the winding body, the increasing frictional resistance of this growing reserve overpowers the spring whereupon the disc moves to a more horizontal position. This permits a pin to become disengaged from a ring on the drive pulley and rotation of the shaft as well as the thread laying arm is stopped.

4. *Rosen U.S. Patent No. 3,796,384*

(D.Exh. 10)

Insofar as its disclosure of a non-rotating drum is concerned, this patent is identical to the earlier Rosen Patent (P.Exh. 5). It discloses control of the thread laying arm as a function of the thread store length in a manner identical to the earlier Rosen Patent. Dr. Tayebi admits that the two patents are identical in this teaching (Tr. 418). Dr. Tayebi also admits that the teaching of the Rosen patents with regard to thread laying arm control as a function of thread storage coil length is the same as the Pfarrwaller (P.Exh. 4, D.Exh. 6) thread feeder (Tr. 418).

## F. DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION.

The device defined by Claim 1 of the Tannert patent (P.Exh. 1) in suit is critically different than the prior art Pourtier wire storage (P.Exhs. 35, 36, D.Exh. 5). The Tannert invention:

a) Is a "thread feeder" for taking, storing, and feeding "thread" to a textile machine.

b) Is a "Thread feeder" with a thread coil storage or winding body which is "fixed" to the feeder chassis or support.

c) Is a "thread feeder" wherein a "thread laying guide" is rotated by "driving means" and that "driving means" is under the control of a "control device . . . operated in response to the length . . . (of the thread coil) store."

d) Is a "thread feeder" wherein the thread moves in a passageway through the thread coil winding body in a direction opposite to the direction in which thread coils are shifted on the outside of the winding body.

e) Is a thread feeder wherein thread is stripped from the second end of the thread coil store, i.e., pulled axially over the winding body end.

Referring to the patent (P.Exh. 35A), translation (P.Exh. 35B), drawing (P.Exh. 36) and Mr. Chadwick's testimony (Tr. 522–29) the Pourtier device, in contrast:

a) Is an *electric cable* storage device which receives and stores *cable* being manufactured by a cable manufacturing machine, as Dr. Tayebi admits (Tr. 433).

b) Is a storage device wherein cable laying onto its storage drum is *not* under control of a control device operated in response to the length of the coiled cable store, as Dr. Tayebi admits (Tr. 348).

c) Is a storage device where the drum constantly receives cable from a constantly rotating arm, as Dr. Tayebi admits (Tr. 433–34).

d) Is a cable storage device where the wire is not guided by a "bead-like means" as it departs, as Dr. Tayebi admits (Tr. 442).

e) Is a storage device wherein cable is not stripped off the drum by being pulled over the drum end but rather is unwound from the drum circumferentially over a rotating arm and pulley, as Mr. Chadwick testified (Tr. 518).

In reviewing these differences between the Pourtier art and the Tannert art, I find that the last difference, the unwinding device in the Pourtier art, is particularly critical. Given the speed at which the modern high-speed loom draws off picks of thread, a passive unwinding device would be simply unworkable. It would, almost undoubtedly

reintroduce such an element of tension that the very function of a thread feeder would be defeated. Alternatively, an active unwinding device would require the sort of powerful driving force and braking mechanism found in rotating drum feeders which has been cited as one of their key disadvantages. I believe my impressions are borne out by the apparent absence of an unwinding in any nonrotating drum feeder brought to my attention. In short, I find that there are significant differences between the Pourtier art and the Tannert art.

The device defined by Claim 1 is also critically different than the Pfarrwaller (P.Exh. 4), Rosen (P.Exh. 5), and Rosen (D.Exh. 10) prior art device. For purposes of their prior art value, these patents are identical as Dr. Tayebi admits (Tr. 418). The Tannert invention:

a) Is a thread feeder with a thread coil storage drum or winding body which is "fixed" to the feeder chassis or support.

b) Is a thread feeder which, because the drum is "fixed" to the chassis, permits the use of a simple and inexpensive yarn coil store sensing device within the drum.

c) Is a thread feeder wherein the thread moves in a "passageway" through the thread coil winding body in a direction opposite to the direction in which thread coils are shifted on the outside of the winding body.

The Pfarrwaller, Rosen, and Rosen prior art devices, in contrast, are:

a) Thread feeders with thread coil storage drum or winding bodies which are *not* "fixed" to the feeder chassis or support. They are, as has been discussed in great detail, loosely mounted on the support and prevented from rotating (or, so to speak, counter-rotated relative to the shaft) by complicated magnetic or unbalanced weight means.

b) Thread feeders which, because their thread coil storage drums are not "fixed", must use yarn coil store sensing devices mounted on separate structure outside the drum (Pfarrwaller) or complicated and ex-

pensive connecting devices inside the drum (Rosen).

c) Are thread feeders wherein the thread does *not* move in a passageway through the thread coil winding body in a direction opposite to the direction in which the thread coils are shifted on the outside of the winding body nor is it guided to this passageway by "bead-like means."

I consider the change from a non-rotating drum mounted on a rotating shaft to a fixed drum significant. In the Rosen and Pfarrwaller art, means must be introduced to maintain the drum in a fixed position on an intermittently rotating shaft. Unbalancing weights, although relatively simple, introduce the problem that they restrict the positioning of the thread feeder: the shaft must be kept in a horizontal position. Alternatively, magnet and armature arrangements introduce elements of complexity and expense. With either adaptation, there is the problem of maintaining the bearings or other means on which the drum rotates. A feeder without these additional bearings, weights, magnets, or armatures would be an advance over the Rosen or Pfarrwaller art.

## G. THE LEVEL OF ORDINARY SKILL IN THE PERTINENT ART.

The third of the major factors set forth in *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693–94, is the level of ordinary skill in the pertinent art. This is certainly the most amorphous of the three elements of the test, as Judge Learned Hand cogently commented:

The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person "having ordinary skill" in an "art" with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, "obvious" is to substitute our

ignorance for the acquaintance with the subject of those familiar with it.

*Reiner v. I. Leon Co.*, 285 F.2d 501, 503–04 (2d Cir.1960), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). A particular danger to any court attempting such a determination is the projection of hindsight on the problem. The old quip "the solution to this problem, once discovered, will be completely obvious," hangs over any determination of the level of ordinary skill in an art which requires an expertise far outside the learning of the law. Courts have repeatedly and rightly cautioned against determinations based on hindsight. *E.g., Yoder Bros, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1378–79 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Charvat v. Commissioner of Patents*, 503 F.2d 138, 144–45 (D.C.Cir. 1974); *Application of Bodley*, 426 F.2d 390, 394 (Cust. & Pat.App.1970); *Kaiser Industries Corp. v. McLouth Steel Corp.*, 400 F.2d 36, 42 (6th Cir.1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969); *Zegers v. Zegers, Inc.*, 365 F.2d 156, 159 (7th Cir.), *cert. denied*, 385 U.S. 948, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Berry Bros. Corp. v. Sigmon*, 317 F.2d 700, 704 (4th Cir.1963); *Honolulu Oil Corp. v. Shelby Poultry Co.*, 293 F.2d 127, 131 (4th Cir.1961); *Manville Boiler Company v. Columbia Boiler Company of Pottstown*, 269 F.2d 600, 603–04 (4th Cir.1959); *Lundy Elect. & Systems, Inc.*, supra, 362 F.Supp. 130, 148; *Hunt Industries, Inc. v. Fibra Boats, Inc.*, 299 F.Supp. 1145, 1148 (S.D.Fla.1969) ("the test of obviousness is not hindsight"); *Blumcraft of Pittsburg v. Citizens & Southern National Bank of South Carolina*, 286 F.Supp. 448, 455–56 (D.S.C.1968).

To avoid a hindsight reconstruction of the relevant art, which would cloud any determination of the level of ordinary skill, it is essential to examine the development of the pertinent art. As another court, faced with a problem comparable to the one raised in this case commented:

[W]e must ultimately resort to a review of the history of the art before and after the invention. Incidentally, such a review in combination with the prescribed

prefatory analysis of the prior patents and publication, is also usually the best, and frequently the only, way to determine "the level of ordinary skill in the art" as further directed by Graham.

*Plantronics, Inc. v. Roanwell Corporation,* 403 F.Supp. 138, 142 (S.D.N.Y.1975), *aff'd,* 535 F.2d 1397 (2d Cir., *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 617 (1976), *reh'g. denied,* 429 U.S. 1079, 97 S.Ct. 826, 50 L.Ed.2d 500 (1977); *and, see generally, Safety Car Heating & Lighting Co. v. General Electric Co.,* 155 F.2d 937 (2d Cir.1946).

■ Concomitantly, the practitioner having "the level or skill in the art" is charged with a comprehensive knowledge of the pertinent prior art. *Continental Can Company v. Crown Cork & Seal Co.,* 415 F.2d 601, 603–04 (3d Cir.1969); *David & David, Inc. v. Myerson,* 388 F.2d 292, 294 (2d Cir.1968); *Anthony v. Ranco, Inc.,* 316 F.2d 509, 511–12 (5th Cir.1963) (the inventor is conclusively presumed to know prior art, whether or not he has actual knowledge); *Andis Clipper Co. v. Oster Corp.,* 481 F.Supp. 1360, 1376 (E.D.Wis.1979); *Novelart Mfg. Co. v. Carlin Container Corp.,* 363 F.Supp. 58 (D.N.J.1973); *Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc.,* 362 F.Supp. 130, 148 (E.D.Va. 1973); *Blair v. Westinghouse Elec. Corp.,* 291 F.Supp. 664, 668–69 (D.C.1968).

Accordingly, to define and evaluate the level of ordinary skill in the art, I turn to a discussion of the development of yarn feeders, directed towards an assessment of the significance (or absence of significance of the plaintiff's invention.

## H. EARLY THREAD FEEDERS.

The weaving looms with which most laypeople are familiar are simple hand looms. On these, there are two sets of vertical threads, and weaving is accomplished by passing a shuttle between them. The shuttle carries the yarn which is laid out as the cross-threads or wefts in the fabric. Modern commercial weaving is done on shuttleless looms. Thread is taken from external spools and forced between the sets of verti-

cal strands, with the looms laying down several hundred wefts per minute.

In high-speed weaving, the tension of the wefts must be kept relatively constant. Where thread is unwound directly from a spool or bobbin, the necessary constancy of tension cannot be maintained. This has led to the development of devices which draw a small store of weft material and feed it, with relatively constant tension into the weaving machine. Such devices are variously called thread feeders, yarn storage feeders, and yarn accumulators. (Tr. 50). In this opinion, for the sake of consistency, I will use the term thread feeder.

The purpose of thread feeders is multifold. Primarily they prevent potential variations in thread tension caused by a poorly wound or damaged thread package from being transmitted to the loom (Tr. 51). In a shuttleless loom, for example, a sudden increase in tension, coupled with the extremely high speeds at which the weft thread is pulled from the thread source, may result in a broken thread and, consequently, loom shutdown.

Mr. Arthur Chadwick, discussing this history of the development, testified that the first device referred to as a thread feeder by skilled practitioners in the textile machinery art was made by Anton Junkers in Germany around 1925. (*See* U.S. Patent 1,849,983, P.Exh. 37).

Subsequent to the development of the Junkers feeders, it was not until the late 1950's that the next innovation in thread feeders appeared. In 1959 Gebreuder Sulzer of Winterthur, Switzerland, developed the feeder illustrated in U.S. patent No. 3,131,729. (P.Exh. 38). This feeder incorporated a rotating drum which drew thread from the feed package. (Tr. 531–32). As will be explained below, one of the significant developments in modern thread feeders is the development of feeders having stationary storage drum. By 1961, the firm of Sobrevin Brevests Industriales (hereinafter "Sobrevin"), an Italian company with headquarters in Lichtenstein, whose experts were A.G. Sarfati and Guiseppe Vischiani, developed the thread feeder disclosed in the

Sarfati et al., United States Patent No. 3,225,446. (P.Exh. 10). Like the Junkers thread feeder, Sarfati's thread feeder relied upon rotation of a drum rotatably mounted on the framework of the textile machine to draw thread from the supply source and, in effect wrap itself in coil after coil of thread. (Tr. 532).

These early rotating drum thread feeders successfully prevented unwanted variations in tension caused by thread spool damage or other problems at the thread source. Unfortunately, these feeders also caused undesired effects. If the thread is twisted while being woven or knit, it either gets a tighter twist or it untwists and becomes fluffy, weakening it and tending to cause it to disintegrate. The rotating drum construction was found, unhappily, to introduce just such an unwanted twist. Specifically, since the drum rotates, it naturally carries the coil store with it. When no thread is being drawn off by the weaving machine, the thread between the endmost coil and the weaving station is rapidly twisted in the direction the drum rotates and substantial unwanted twist is created until the coil store is full and the drum rotation stops. When weaving does start, the twisted thread segment is woven into the fabric and creates a striation in the fabric because of the difference of the tightness of its twist compared to the thread alongside it. (Tr. 74–85).

The rotating drum also presented other problems. Since the drum itself was constantly starting and stopping or speeding and slowing, its mass had to be taken into consideration with regard to the power required for starting-driving the drum and the braking force required for slowing-stopping the drum. A small but relatively powerful motor and a commensurately strong braking system was required. The result was relatively sophisticated construction, and thus a relatively expensive feeder. (Tr. 55–57, 74–85).

These various problems associated with rotating drum feeder led in about 1960 to efforts to develop a thread feeder in which the drum would be stationary, and the thread would be coiled around the drum by means of a rotating arm of considerably smaller mass commensurately easier to start and stop.

## I. NON–ROTATING THREAD FEEDERS.

The Pourtier cable-winding device (P.Exh. 35, D.Exh. 5) preceded the development of thread feeders having a non-rotating winding-body. In the Pourtier device, the winding body, is fixed on a shaft, so that it cannot rotate. There are two rotating arms, one at either end of the winding body. The rotating arm at the end away from the cable source is situated so that the cable coming to it travels outside the winding body. This arm lays cable continuously on the drum, with the coil-store moving back toward the cable source. (This, of course, contrasts with the movement of the coil-store in Pfarrwaller, in which the coil-store moves away from the source). A second arm operates intermittently to circumferentially unwind cable from the end of the drum closer to the source. The cable is then pulled through the hollow shaft, thus passing through the drum. The rotation of the second arm is controlled by two photo-electric cells mounted on the drum, which are activated by an external light source when the thread store is depleted. When the cells are activated, the unwinding arm is disengaged, allowing additional coil store to build up on the drum. This additional coil store covers the cells, and the unwinding arm is then re-engaged.

While this device was patented in West Germany in 1965, there is no evidence in the record of this case indicating that its art was adapted for use in thread feeders before the introduction of the Tannert device.

By 1960, yarn feeding experts had concluded that the various problems associated with a rotating-drum feeder required the development of a device in which the drum remained stationary. The first practical fixed-drum thread feeder was invented in 1965 by Erwin Pfarrwaller, and is shown in U.S. patent 3,411,548 (P.Exh. 4), which is extensively discussed in the prior art sec-

tion, *supra*. This device did include a winding body which did not rotate, but it was kept stationary only through the use of complex and relatively expensive means: a magnet and armature system acting from outside the drum, or unbalancing weights inside the drum. (Tr. 535–36). Further, because the drum is mounted on an intermittently rotating shaft rather than on any fixed object, any device for controlling the thread-laying arm in response to the length of the coil store on the drum either had to be placed outside the drum, or had to have an intricate mechanism for carrying the start-stop signals from the stationary drum through the rotating shaft.

At the time Erwin Pfarrwaller introduced his device, he had the Pourtier patent for a cable-winding device available for his use. Despite a lengthy career as an extraordinarily prolific inventor in the field of textile machinery, including six patents directed specifically to thread feeders and over 100 American patents concerning textile machinery and methods (see P.Exh. 42), Pfarrwaller built a device which did not take advantage of the advantages of the Pourtier construction concerning yarn path, advantages which are now quite apparent.

The next significant advance in the art of thread feeders came in 1970, with the patenting of another Pfarrwaller device, U.S. patent 3,761,031 (P.Exh. 14). Again, the drum, although stationary, is mounted on a rotating shaft and must be kept stationary (or counter-rotated) by magnets or eccentric weights. Further, the device for sensing the length of the coil store is, as in the earlier Pfarrwaller device (P.Exh. 4), external to the winding body.

This device was followed by others, such as the Sobrevin device, U.S. patent 3,791,-598 (P.Exh. 16); the Ruti devices, U.S. patents 3,519,025 (P.Exh. 31), and 3,575,025 (P.Exh. 32); the Teijin Limited device, West German patent (DT–PS 2,039,716 (P.Exh. 33); the earlier Rosen device, U.S. patent 3,720,384 (P.Exh. 5), extensively discussed above; and the Wesco device, U.S. patent 3,737,112 (P.Exh. 40). An examination of each of these patents shows that the

inventor stationed a winding body on a rotating shaft, and then faced the two problems mentioned previously: the need to create a counter-rotational effect, and the requirement of having either an external device for measuring the size of the coil store or an intricate mechanism for carrying the signal from the stationary drum across an intermittently rotating shaft.

This was the state of the prior art at the time of the plaintiffs' claimed invention underlying U.S. patent 3,796,386 (P.Exh. 1). A practitioner having the level of ordinary skill would be familiar with rotating winding-body feeders, which prove unworkable in the weaving context; with the Pfarrwaller art and subsequent feeders having a non-rotating, rotatably-mounted winding bodies; and with the Pourtier art for cable making machines, with its fixed drum and reversed winding path.

■ I believe that from this collection of devices, all of the various elements of the plaintiff's device *could* be found. Prior to the Tannert invention, however, no one had put all of these elements together. The want of a successful combination before Tannert's suggests invention. *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1963).

Until the Tannert invention, there had been no device which provided the particular advantages that that device provides in the thread feeder art. After a very lengthy examination of the pertinent prior art as cited by the parties, consideration of the testimony of the opposing expert witnesses, and review of the relevant authorities, I can see how the Tannert invention can be developed from the prior art. I cannot be certain, however, that any such understanding of the evolution of thread feeder art is fundamentally the product of hindsight. In this case, I feel it is appropriate to turn to the secondary consideration mentioned in *Graham v. John Deere Company,* 383 U.S. at 18, 86 S.Ct. at 694, because, if at all possible, this Court must render a determination based on objective rather than subjective analysis. *Honolulu Oil Corp. v.*

*Shelby Poultry Co.,* 293 F.2d 127, 131–32 (4th Cir.1961).

### J. COMMERCIAL IMPACT OF THE TANNERT PATENT.

The Tannert patent illustrated the first thread feeder embodying a fixed winding body and a thread path in which the coil store moves on the winding body towards the thread store. The plaintiffs cite abundant art subsequent to the Tannert invention which adopts this configuration. Many of these devices were patented by the same companies which had previously developed thread feeders following the basic teaching of Pfarrwaller. (*See* Sobrevin West German patent DT–OS 2.142,486, P.Exh. 52; U.S. Patent 3,921,925, P.Exh. 21; U.S. Patent 3,999,447, P.Exh. 22; Wesco U.S. patent 3,782,661, P.Exh. 24; Elitex West German application DT–OS 2,410,791, P.Exh. 46; Savio U.S. patent 4,037,802, P.Exh. 50; Memminger West German application DT–OS 2,415,413, P.Exh. 41; *See also* P.Exh. 15, various patents in which Tannert has rights or licenses).

Beyond the tribute paid to the Tannert invention by other inventors who have followed his teaching, the Tannert device has enjoyed considerable commercial success. AB Iro took a non-exclusive license under which it pays a royalty rate of one percent. For this license, it has made payment of approximately $230,000.00 (Tr. 638–40). Wesco took a license from Tannert (P.Exh. 67), under which they advanced Tannert $60,000 against a four percent royalty on the net selling price of all feeders sold by Wesco or any sub-licensee. In return, Wesco became the exclusive licensee subject to the previously granted non-exclusive licenses held by Iro and Memminger. In anticipation of substantial commercial success, Wesco agreed to pay royalty minimums for 20,000 thread feeders in 1977 and 30,000 thread feeders every year thereafter while it held an exclusive license. While I discount the significance of these licenses somewhat because of the significant participation of the plaintiffs, I believe it is relevant to the determination of the question of obviousness. *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1059 (4th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Shaw v. E.B. & A.C. Whiting Company,* 417 F.2d 1097, 1105–06 (2d Cir.1969); *Otto v. Koppers Co.,* 246 F.2d 789, 799–800 (4th Cir.1956), *cert. denied,* 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420 (1958).

Sulzer, even though it has the services of the prolific inventor Pfarrwaller, has bought Iro's IWF feeders for their weaving machines rather than using any of the Pfarrwaller designs. Sulzer has purchased or ordered between four and five thousand IWF units. (Tr. 666.) Given the importance of Pfarrwaller, I regard this purchase as clearly indicating the commercial success of the Tannert device.

Considerable evidence of the impact of the Tannert device is also indicated by the fact that the plaintiffs hold a considerable share of the market, some 15% in 1979. To anticipate the ruling concerning infringement set forth *infra,* the defendant's share of the market (some 30% as of 1979) must be added to this figure. The total share of the market, some 45 percent indicates a prompt and dramatic shift to the Tannert teaching. This is evidence of non-obviousness. *Eibel Process Co. v. Minnesota & Ontario Paper Co.* 261 U.S. 45, 54–56, 43 S.Ct. 322, 325, 67 L.Ed. 523 (1923); *Marvel Specialty Co. v. Bell Hosiery Mills, Inc.,* 330 F.2d 164, 172 (4th Cir.), *cert. denied,* 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964); *Berry Brothers Corp. v. Sigmon,* 317 F.2d 700, 703 (4th Cir.1963); *Rohm & Haas Co. v. Roberts Chemicals,* 245 F.2d 693, 696–97 (4th Cir.1957); *Diamond International Corp. v. Walterhoefer,* 289 F.Supp. 550 (D.Md.1968).

A final factor which this Court considers relevant to the determination of the obviousness question again anticipates the ruling concerning infringement, *infra:* I find that the defendants have essentially copied the Tannert device in their West 840 and West 1000 thread feeders. I believe that this brings the case within the rule that the defendants' imitation of an allegedly obvious patent suggests that the invention is not obvious. *Diamond Rubber*

Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527 (1911); Shaw v. E.B. & A.C. Whiting Company, 417 F.2d 1097, 1107 (2d Cir.1969); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 269 (2d Cir. 1967); Strong-Scott Mfg. Co. v. Weller, 112 F.2d 389, 395 (8th Cir.1940); Trico Products Corp. v. Ace Products Corp., 30 F.2d 688, 691 (D.Conn.1929).

Considering all of these factors together, I find that they establish that the Tannert patent has had considerable commercial success. Under the test in Graham, supra, this is a secondary factor. It cannot counter obviousness. On the other hand, in an otherwise close case, this commercial success suggests nonobviousness.

I also mention two other factors which I have weighed in this critical determination, to acknowledge that the parties have raised these legitimate points.

First, each side has presented a well-credentialed expert witness: Mr. Arthur Chadwick for the plaintiffs, and Dr. Amed Tayebi for the defendants. Each man is an established expert in his field, having far more extensive knowledge of these technical matters than this member of the Court possesses. While I mean no criticism of Dr. Tayebi, in my evaluation of the evidence in this case, I am more attracted to the opinions presented by Mr. Chadwick, especially on the question of obviousness. I found particularly that his long practice in the field of textile machinery development gives him a greater degree of credibility on these issues.

Second, decisions from German and Italian courts have been cited to the Court. These have given me cause, but they have played very little in the determination of this case. This Court has no experience with the patent laws of those foreign countries, and no resources with which to evaluate them.

### K. CONCLUSION: THE TANNERT PATENT IS NONOBVIOUS AND VALID.

██ Having carefully reviewed the many documentary exhibits and the exten-sive testimony which both parties have submitted on this question, I conclude that the presumption of validity which attaches to a patent is not disturbed; that the Tannert invention is not anticipated by prior art; that there are significant differences between the Tannert device and prior art; that the Tannert device has achieved significant commercial success. From these conclusions I am led to a further conclusion, that the Tannert invention would not have been obvious to one of ordinary skill in the art at the time of the invention. Therefore, I conclude that the defendants have not shown that the plaintiff's patent is invalid as obvious under 35 U.S.C. § 103. I further conclude that the plaintiff's patent is valid and enforceable.

### II.

### INFRINGEMENT OF THE TANNERT PATENT

Having determined that the Tannert patent is valid, and therefore enforceable against those who infringe, I turn to the question of infringement.

### A. THE CLAIMS OF THE TANNERT PATENT.

The Tannert patent in suit (P.Exh. 1) contains forty-one (41) claims. Many of these claims cover forms of the invention which are not at issue here, however. Iro has charged Roj and Otex with infringement of only Claims 1, 9, 10, 11, 12, 28 and 39 of the Tannert patent. "It is elementary patent law that one looks to the claims to find out what 'the invention' is." Application of Kirchner, 305 F.2d 897, 900, 49 CCPA 1234 (C.C.P.A.1962); accord Aro Manufacturing Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 reh. denied 365 U.S. 890, 81 S.Ct. 1024, 6 L.Ed.2d 201 (1961) ("the claims made in the patent are the sole measure of the grant"); Continental Paper Bag Company v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed.

**444**

1122 (1908); *Lockheed Aircraft Corporation v. United States,* 553 F.2d 69 (Ct.Cl.1977); *Technitrol, Inc. v. Control Data Corp.,* 550 F.2d 992, 998 (4th Cir.) *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 79 (1977); *Richen-Gemco, Inc. v. Heltra, Inc.,* 540 F.2d 1235 (4th Cir.1976); *Duplan Corp. v. Deering Milliken, Inc.,* 370 F.Supp. 769 (D.S.C. 1973); *Maschinenfabrik Rieter, A.G. v. Greenwood Mills,* 340 F.Supp. 1103, 1118 (D.S.C.1972); *Welch v. General Motors Corporation,* 330 F.Supp. 80 (E.D.Va.1970); *Powell Manufacturing Company, Inc. v. Long Mfg. Company,* 319 F.Supp. 24, 31 (E.D.N.C.1970); *Wilcox Mfg. Co. v. Eastern Gas & Fuel Associates,* 278 F.Supp. 34 (S.D. W.Va.1967), *aff'd,* 400 F.2d 960 (4th Cir. 1968), *cert. denied,* 393 U.S. 1051, 89 S.Ct. 691, 21 L.Ed.2d 693 (1969); *Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc.,* 191 F.Supp. 652, 659 (M.D.N.C.1961), *aff'd.* 299 F.2d 793 (4th Cir.), *cert. denied,* 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504 (1962). Therefore, I set forth Claims 1, 9, 10, 11, 12, 28, and 39, displayed in a format which will facilitate evaluation of these claims, plaintiff Iro's contentions of infringement, and Roj and Otex' defenses.

Claim 1) A thread feeder adapted to be interposed between a supply source and textile machine in which the thread feeder is adapted to accumulate at least several coils of thread for storage purposes axially along a winding body,

said coils of thread forming a store of coils,

the thread feeder being constructed to add coils at one end of the store from the supply source,

and the textile machine adapted to strip coils from the second end of the store,

the thread feeder adapted to have the coils shifted in the direction from the one end of the store to the second end thereof,

said thread feeder comprising:

A. a support for mounting on a textile machine,

B. a winding body being fixed to said support and

i. being stationary relative thereto and

ii. adapted to have coils of thread wound thereon to form a store of coils extending side by side along the length of said winding body,

iii. the winding body being elongated and generally circular in cross section, and

iv. the store forming a geometrical arrangement symmetrically about and coaxial with the axis of said winding body,

C. a rotating thread-laying guide mounted on said support for rotation coaxially with the axis of the winding body

i. the thread adopted to be fed from the supply source to said thread-laying guide,

ii. said thread-laying guide being located to lay a coil of thread onto said winding body at a location constituting the beginning and one end of said store,

iii. said location remaining fixed at all times during the operation of said thread feeder,

D. means for axially shifting said coils in a direction away from said location while said thread-laying guide is rotating to form said store,

i. the coil furthest from said location comprising the second end of said store,

ii. the number of coils in the store and hence the position of said second end being variable,

E. means for driving said rotating thread-laying guide,

F. a control device for controlling said driving means and

i. operated in response to the length of said store, and

G. a passageway through said winding body approximately at the axis thereof and

i. means for guiding said thread during the operation of said thread feeder to move through said passageway in a direction opposite to the direction in which said coils are shifted.

Claim 9) The thread feeder as claimed in claim 1 in which

A. the thread from said supply source is adapted to be fed directly to said thread-laying guide and enters said passageway after being stripped off said winding body.

Claim 10) The thread feeder as claimed in claim 9 in which

A. the structure forming said passageway is fixed to said support.

Claim 11) The thread feeder as claimed in claim 1 in which

A. the coils of thread are stripped from said store in the same direction as said coils of said store are shifted in the forming of said store and

B. bead-like means are provided to guide the thread of said stripped-off coils into said passageway on to said textile machine.

Claim 12) The thread feeder as claimed in claim 1 in which

A. said means for axial shifting of said coils comprise a positive axial feed device

i. coupled with said means for driving the said thread-laying guide.

Claim 28) The thread feeder as claimed in claim 1 in which

A. the winding body and store are frusto-conical.

Claim 39) In a thread feeder for feeding thread from a supply source to a textile machine and which includes a support,

a winding body carried on said support, means for winding a plurality of coils on said winding body to form a store of axially arranged side by side coils connected between the supply source and the textile machine,

means for progressively shifting the coils of said store from one end thereof to the second end in the direction that the coils are being shifted:

the invention herein comprising:

A. the winding body being fixed to said support and being stationary,

B. said winding means including

i. driven rotating means journaled on said support and

ii. driving means for operating said driven means,

iii. a rotating thread-laying guide coupled with said driven means and rotated thereby for laying thread onto said winding body to form said store

iv. means for leading thread from said supply source to said thread-laying guide,

C. Control means for controlling the operation of said driving means in response to the length of said store

D. means fixed relative to said support and winding body forming a passageway passing through the winding body axially of the coils forming said store, and

E. bead-like means for guiding the thread being stripped off said second end of the store to pass through said passageway in a direction opposite the direction in which the coils are shifted and thereafter to pass said textile machine.

It is these claims which the plaintiff Iro asserts are infringed by the defendants' thread feeders.

## B. PLAINTIFF IRO'S PRIMA FACIE CASE OF INFRINGEMENT.

To establish its infringement case, the plaintiff relied on the testimony of its expert witness, Mr. Arthur Chadwick, whose expertise the Court acknowledges. Mr. Chadwick studied a West 1000 feeder, and conjunctively studied the West 1000 Instruction and Spare Parts Book, (P.Exh. 29) and a schematic diagram of the West 1000 thread feeder originally prepared by Roj (P.Exh. 30, which is appended hereto). (Tr. 166–67.) In his studies, Mr. Chadwick identified thirteen features on the West 1000 thread feeder which he regarded as covered by the various claims listed above. For ease of presentation, Mr. Chadwick set forth these thirteen features in charts (P.Exh. 19A–19D), and then drew up a second series of charts showing that each of the thirteen identified features of the West

1000 feeder was described in the patent claims (P.Exh. 20A–20H). Mr. Chadwick testified that, based on his examination of the West 1000 feeder and the supporting materials for that machine, he found that claims of the Tannert patent set forth above described the various features described in his charts (Tr. 168–76, 182–202); that is the West features read on the Tannert patent claims.

For ease of understanding, I have combined the description found in Plaintiffs' Exhibits 19 and 20, and set forth the resulting comparison here:

| Claim Limitations | West 1000 Features |
| --- | --- |
| 1) A thread feeder adapted to be interposed between a supply source and a textile machine in which the thread feeder is adapted to accumulate at least several coils of thread for storage purposes axially along a winding body, said coils of thread forming a store of coils, the thread feeder being constructed to add coils at one end of the store from the supply source and the textile machine adapted to strip coils from the second end of the store, the thread feeder adapted to have the coils shifted in the direction from the one end of store to the second end thereof, said thread feeder comprising: | Feature 1 is adapted to be interposed between a thread supply source and a textile machine; |
| A. a support for mounting on a textile machine, | Feature 2 includes a support for mounting on a textile machine; |
| B. a winding body being said support and | Feature 3 includes a winding body fixed to the support; |
| i. being stationary thereto | Feature 3a stationary relative thereto; |
| ii. adapted to have coils of thread wound thereon to form a store of coils extending side by side along the length of said winding body, | Feature 8b that coil of thread laid by the thread-laying mechanism onto the winding body constitutes the beginning and one end of a store of several coils extending side by side along the length of the winding body to a coil farthest from the plane comprising the second end of the store; |

| iii. | the winding body being elongate and generally circular in cross section, and | : : : : : | Feature 3c with the winding body being elongate, generally circular in cross-section, and frusto-conical in shape; |
|---|---|---|---|
| iv. | the store forming geometrical arrangement symmetrically about and coaxial with the axis of said winding body, | : : : : : : : : | Feature 8c the store forms a frusto-conical geometric arrangement symmetrically about and coaxial with the axis of the winding body; |
| C. | a rotating thread laying guide mounted on said support for rotation coaxially with the axis of the winding body, | : : : : : : : : | Feature 6 includes a thread-laying guide coupled with the driven means, mounted on the support for rotation coaxially with the axis of the winding body, and rotated by the driven means; |
| i. | the thread adapted to be fed from the supply source to said thread-laying guide, | : : : : : | Feature 7 includes means for leading thread from the supply source to the thread laying guide; |
| ii. | said thread laying being located to lay a coil of thread onto said winding body at a location constituting the beginning and one end of said store, | : : : : : : : : : : : : : : : : : : : : : : : : : : | Feature 8 Feature 8b is constructed and arranged wherein the thread-laying guide is located in such a position relative to the winding body that as the thread-laying guide rotates it takes or is fed thread directly from the supply source and lays a coil of thread onto the winding body in a never changing circular path lying in a plane extending perpendicular to the axis of said winding body; and that coil constitutes the beginning and one end of a store of several coils extending side by side along the length of the winding body to a coil farthest from the plane comprising the second end of the store; |

```
iii. said location : Feature 8a
 remaining fixed at:
 all times during : the location of the plane is
 operation of said : fixed relative to the axis
 thread feeder, : and therefore the location
 : of the circular path and the
 : coil being laid on the wind-
 : ing body is fixed relative
 : to the axis;
 :
D. means for axially : Feature 9
 shifting said coils :
 in a direction away : Feature 9a
 from said location :
 while said thread- : includes a positive axial feed
 laying guide is : device which is coupled with
 rotating to form said: the driving means; and while
 store, : the thread laying guide is
 : rotating to form the store
 : the feed device progressively
 : shifts the coils in the store
 : axially of the winding body
 : in a direction away from the
 : aforementioned plane and from
 : the one end of the store to
 : the coil furthest from the
 : plane comprising the second
 : end of the store;
 :
 i. the coil furthest: Feature 9a
 from said loca- : while the thread laying guide
 tion comprising : is rotating to form the store
 the second end of: the feed device progressively
 said store, : shifts the coils in the store
 : axially of the winding body
 : in a direction away from the
 : aforementioned plane and from
 : the one end of the store to
 : the coil furthest from the
 : plane comprising the second
 : end of the store;
 :
 ii. the number of : Feature 13a
 coils in the : the number of coils in the
 store and hence : store and hence the position
 the position of : of the second end is variable.
 said second end :
 being variable, :

E. means for driving : Feature 4
 said rotating thread-: includes driven rotating
 laying guide, : means journaled on the
 : support;
 :
 : Feature 5
 : includes driving means for
 : operating the driven means;
```

| | | |
|---|---|---|
| | | : Feature 6<br>: includes a thread-laying<br>: guide coupled with the<br>: driven means, mounted on the<br>: support for rotation coaxi-<br>: ally with the axis of the<br>: winding body, and rotated by<br>: the driven means; |
| F. | a control device for<br>controlling said<br>driving means and | : Feature 13 |
| | i. operated in<br>response to the<br>length of said<br>store, and | : Feature 13<br>: includes a control device for<br>: controlling the operation of<br>: the driving means in response<br>: to the axial length of the<br>: store of coils. |
| G. | a passageway through<br>said winding body<br>approximately at the<br>at the axis thereof<br>and | : Feature 10<br>: includes means fixed relative<br>: to the support and winding<br>: body forming a passageway<br>: axially through the winding<br>: body and coils forming the<br>: store approximately at the<br>: axis of the winding body; |
| | i. means for guiding<br>said thread dur-<br>ing the operation<br>of said thread<br>feeder to move<br>through said pas-<br>sageway in a<br>direction oppo-<br>site to the<br>direction in<br>which the said<br>coils are shif-<br>ted. | : Feature 11<br>: operates in such a manner<br>: that the coils at the second<br>: end of the store are freely<br>: stripped off the winding<br>: body store in the direction<br>: that the coils of the store<br>: are being shifted on the<br>: winding body in forming the<br>: store; |
| | | : Feature 12<br><br>: includes bead-like means<br>: which lift the thread in<br>: each coil as it is stripped<br>: off the winding body radi-<br>: ally outwardly of the winding<br>: body and, |
| | | : Feature 12a<br>: guides the stripped-off<br>: thread in such a manner as to<br>: reverse its direction of<br>: travel and guide it into the<br>: passageway on the way to the<br>: textile machine, in a direc-<br>: tion opposite the direction |

 : in which the coils are being
 : shifted on the winding body.

---

9) The thread feeder as : Feature 8
claimed in claim 1 in which : is constructed and arranged
 : wherein the thread-laying
 : guide is located in such a
 : position relative to the
 : winding body that as the
 : thread-laying guide rotates
 : it takes or is fed thread
 : directly from the supply
 : source and lays a coil of
 : thread onto the winding body
 : in a never changing circular
 : path lying in a plane extend-
 : ing perpendicular to the axis
 : of said winding body;

 : Feature 12
 : includes bead-like means
 : which lift the thread in each
 : coil as it is stripped off
 : the winding body radially
 : outwardly of the winding body.
 :

A. the thread from said : Feature 12a
 supply source is : guides the stripped-off
 adapted to be fed : thread insuch a manner as to
 directly to said : reverse its direction of
 thread laying guide : travel and guide it into the
 and enters said pas- : passageway on the way to the
 sageway after being : textile machine, in a direc-
 stripped off said : tion opposite the direction
 winding body. : in which the coils are being
 : shifted on the winding body.

---

10) The thread feeder as: Feature 10
claimed in claim 9 in which : includes means fixed relative
 : to the support and winding
A. the structure form- : body forming a passageway
 ing said passageway : axially through the winding
 is fixed to said : body and coils forming the
 support. : store approximately at the
 : axis of the winding body;

---

11) The thread feeder as: Feature 11
claimed in claim 1 in which : operates in such a manner
 : that the coils at the second
A. the coils of thread : end of the store are freely
 are stripped from : stripped off the winding
 said store in the : body store in the direction
 same direction as : that the coils of the store
 said coils of said : are being shifted on the
 store are shifted in : winding body in forming the
 the forming of said : store;
 store and :

| | |
|---|---|
| B. bead-like means are provided to guide the thread of said stripped-off coils onto said passageway on the way to said textile machine | Feature 12<br>includes bead-like means which lift the thread in each coil as it is stripped off the winding body radially outwardly of the winding body and,<br><br>Feature 12a<br>guides the stripped-off thread in such a manner as to reverse its direction of travel and guide it into the passageway on the way to the textile machine, in a direction opposite the direction in which the coils are being shifted on the winding body. |
| 12) The thread feeder as claimed in claim 1 in which<br><br>A. said means for axial shifting of said coils comprise a positive axial feed device<br><br>i. coupled with said means for driving the said thread-laying guide. | Feature 9<br>includes a positive axial feed device which is coupled with the driving means; and<br><br>Feature 9a<br>while the thread laying guide is rotating to form the store the feed device progressively shifts the coils in the store axially of the winding body in a direction away from the aforementioned plane and from the one end of the store to coil furthest from the plane comprising the second end of the store; |
| 29) The thread feeder as claimed in claim 1 in which<br><br>A. the winding body and store are frustoconical. | Feature 3c<br>with the winding body being elongate, generally circular in cross-section, and frusto-conical in shape;<br><br>Feature 8c<br>the store forms a frusto-conical geometric arrangement symmetrically about and coaxial with the axis of the winding body; |
| 39) In a thread feeder for feeding thread from a supply source to a textile machine and which includes a support, a winding body | Feature 1<br>is adapted to be interposed between a thread supply source and a textile machine; |

| | |
|---|---|
| carried on said support, means for winding a plurality of coils on said winding body to form a store of axially arranged side by side coils connected between the supply source and the textile machine, means for progressively shifting the coils of said store from one end thereof to the second end thereof, the coils at the second end adapted to be freely stripped off said second end in the direction that the coils are being shifted, the invention herein comprising: | Feature 3 includes a winding body fixed to the support; |
| | Feature 6 includes a thread-laying guide coupled with the driven means, mounted on the support for rotation coaxially with the axis of the winding body, and rotated by the driven means; |
| A. the winding body being fixed to said support and being stationary, | Feature 3 includes a winding body fixed to the support; |
| | Feature 3a stationary relative thereto; |
| B. said winding means including | Feature 4 includes driven rotating means journaled on the support; |
| i. driven rotating means journaled on said support and | |
| ii. driving means for operating said driven means, | Feature 5 includes driving means for operating the driven means; |
| iii. a rotating thread-laying guide coupled with said driven means and rotated thereby for laying thread onto said winding body to form said store, | Feature 6 includes a thread-laying guide coupled with the driven means, mounted on the support for rotation coaxially with the axis of the winding body, and rotated by the driven means; |
| | Feature 8 is constructed and arranged wherein the thread-laying guide is located in such a position relative to the winding body that as the thread-laying guide rotates it takes or is fed thread directly from the supply source and lays a coil of thread onto the winding |

: body in a never changing
: circular path lying in a
: plane extending perpendi-
: cular to the axis of said
: winding body; and

: Feature 8a
: the location of the plane is
: fixed relative to the axis
: and therefore the location
: of the circular path and the
: coil being laid on the wind-
: ing body is fixed relative
: to the axis;

: Feature 8b
: that coil constitutes the
: beginning and one end of a
: store of several coils
: extending side by side along
: the length of the winding
: body to a coil farthest from
: the plane comprising the
: second end of the store;

iv. means for leading: Feature 7
thread from said : includes means for leading
supply source to : thread from the supply
said thread lay- : source to the thread laying
ing guide, : guide,

C. control means for : Feature 13
controlling the : includes a control device
operation of said : for controlling the opera-
driving means in : tion of the driving means
response to the : in response to the axial
length of said store,: length of the store of coils;

D. means fixed relative : Feature 10
to said support and : includes means fixed relative
winding body forming : to the support and winding
a passageway passing : body forming a passageway
through the winding : axially through the winding
body axially of the : body and coils forming the
coils forming said : store approximately at the
store, and : axis of the winding body;

E. bead-like means for : Feature 12
guiding the thread : includes bead-like means
being stripped off : which lift the thread in
said second end of : each coil as it is stripped
the store to pass : off the winding body radi-
through said passage-: ally outwardly of the wind-
way in a direction : ing body and,
opposite the direc- :
tion in which the : Feature 12a
coils are shifted and: guides the stripped-off
thereafter to pass to: thread in such a manner as

```
to pass to said : to reverse its direction of
textile machine. : travel and guide it into the
 : passageway on the way to the
 : textile machine, in a direc-
 : tion opposite the direction
 : in which the coils are being[1]
 : shifted on the winding body.
```

The plaintiff Iro contends that, having found the features described by Mr. Chadwick on the West feeder and shown that these features correspond to claims in the Tannert patent, it has shown patent infringement.

Countering, the defendants contend that Mr. Chadwick's testimony and charts are not a direct comparison of the defendants' device and the patent claims as required by law, and are therefore inadequate to show infringement. Having reviewed the testimony and the documentary exhibits, I find the defendants' argument untenable. The defendants begin their argument by noting that the plaintiffs did not introduce a West 1000 thread feeder into evidence as an exhibit. They suggest that without introducing an actual thread feeder the plaintiffs cannot make valid evaluations as to what features are found on this device. I do not believe this argument is sound. The law requires direct comparison, not literal introduction. With massive machinery, such a requirement would be impossible; with super-miniaturized products, it would be pointless; with volative chemicals, it would be hazardous. In this case, it was not required.

The defendants' argument might have merit if the evidence before the Court was inadequate to allow full evaluation of the defendants' device. The defendants do not argue that the evidence is inadequate. I find it is quite sufficient. While the Court does not have an actual West 1000 thread feeder in evidence, it does have technical drawings, originally prepared by the defendants (P.Exh. 30), the accuracy of which is not disputed; the Instruction and Spare Parts Book (P.Exh. 29), which was prepared by defendants; and numerous other exhibits including photographs, brochures, drawings, and descriptions. I also note that in response to a Request for Admissions, the defendants stated that

> Defendants admit that the West 1000 thread feeder and the West 840 thread feeder have been manufactured and sold by Roj and Otex, respectively, in accordance with brochures and other technical data which has already been supplied by defendants herein to the plaintiff from which plaintiff should be fully informed and capable of drawing its own conclusions concerning infringement....

(Defendants' Response to Plaintiff Iro's Request for Admission # 5, P.Exh. 79.) Further William L. Lehmann, Executive Vice-President of Otex, Incorporated, indicated in his deposition that the Instructions and Spare Parts Book was sufficient to familiarize users of West 1000 feeders with the working of the device. Referring to that book and the drawing (P.Exh. 30), Mr. Lehmann was able to discuss fully the features of the device. (See Deposition of William L. Lehmann, P.Exh. 30, at 55–73.) Finally, I note that in presenting their case contending that the West 1000 feeder stemmed from prior art rather than the Tannert patent, the defendants did not introduce an actual thread feeder, but like the plaintiffs, relied on diagrams, drawings, and descriptions. I find the evidence of record was sufficient to allow this Court to discern the features of the West 1000 feeder (and the earlier version West 840 thread feeder), and to determine whether those features infringe the Tannert patent.

---

1. In preparing this table, I have made certain changes in the wording used to describe the feature found by Mr. Chadwick in order to clarify the language. Except for these minor modifications, this table is a verbatim reproduction of Plaintiffs' Exhibits 19 and 20. I believe these changes only clarify and do not alter Mr. Chadwick's meaning.

Defendants criticize Mr. Chadwick's evaluations as an *ex parte* examination, citing *Reynolds Metals Company v. Aluminum Company of America,* 457 F.Supp. 482 (N.D. Ind.1978), and *Popeil Bros., Inc. v. Schick Electric, Inc.,* 356 F.Supp. 240, 250 (N.D.Ill. 1972), *aff'd* 494 F.2d 162 (7th Cir.1974). I find these cases, and *Illinois Tool Works, Inc. v. Foster Grant Company, Inc.,* 547 F.2d 1300 (7th Cir.1974), *cert. denied,* 431 U.S. 929, 97 S.Ct. 2631, 53 L.Ed.2d 243 (1977) which is cited in *Reynolds Metals, supra,* inapposite. Each case deals with patents covering process as distinguished from a mechanical device as in this case. On close reading of these cases, I believe that the objection to the tests was not that they were performed outside the presence of the court or the opposing party, but that they were one-sided and of questionable validity. In *Illinois Tool Works, supra,* for example, the Court noted that the tests left to chance many variables which could influence the results. *See* 547 F.2d at 1314. Similarly, in *Popeil Bros., supra,* the court discounted the credibility of tests in which a party could not assure the court that the tests had followed the process in issue. *See* 356 F.Supp. at 250.

In this case, this Court has reviewed the process by which Mr. Chadwick gathered the information which set forth in the table above. Mr. Chadwick examined a West 1000 feeder and documents of undisputed reliability (Tr. 174, 175). He prepared the various charts which have been introduced into evidence (P.Exhs. 19 & 20) in order to facilitate an understanding of the questions in issue in a complicated, technical matter. I have reviewed the relevant exhibits and Mr. Chadwick's testimony, and I find no indication that his articulation of the various features introduced any inaccuracy or bias which would undercut the validity of his opinions.

The defendants contend this is not a direct comparison of the defendants' device with the plaintiffs' patent claims. I disagree. I find that the features of the defendants' West 1000 (and West 840) thread feeders fall clearly within the language of the enumerated claims. There is

thus infringement under the test set forth by the Supreme Court in *Graver Tank Company v. Linde Air Products Company,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950):

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused material falls clearly within the claim, infringement is made out and that is the end of it.

This is the accepted test for cases of this sort. *Studiengesellschaft Kohle v. Eastman Kodak Company,* 616 F.2d 1315, 1324 (5th Cir.1980); *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.,* 515 F.2d 534, 540 (6th Cir.1975); *Laser Alignment, Inc. v. Woodruff & Sons, Inc.,* 491 F.2d 866, 872 (7th Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Ziegler v. Phillips Petroleum Company,* 483 F.2d 858, 868 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973); *Orthman Manufacturing v. Chromalloy American Corporation,* 512 F.Supp. 1284, 1295 (C.D.Ill. 1981); *B & J Manufacturing Company v. Hennessy Industries, Inc.,* 493 F.Supp. 1105, 1125 (N.D.Ill.1979); *Swift Chemical Company v. Usamex Fertilizers, Inc.,* 490 F.Supp. 1343 (E.D.La.1980); *Duplan Corporation v. Deering Milliken, Inc.,* 370 F.Supp. 769, 772 (D.S.C.1973); *Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc.,* 362 F.Supp. 130, 159 (E.D.Va.1973), *aff'd* 493 F.2d 1222 (4th Cir.1974); *Phillips Electronic and Pharmaceutical Industries Corporation v. Thermal and Electronics Industries, Inc.,* 311 F.Supp. 17, 40 (D.N.J.1970); *Eagle Iron Works v. McLanahan Corporation,* 303 F.Supp. 1029, 1044 (W.D.Pa.1969).

The evidence also shows and I find that subsequent to March 12, 1974, the issue date of the Tannert patent in suit, and prior to the filing of this action for infringement, defendant Otex, Inc. sold West 840 and West 1000 thread feeders in South Carolina. (Defendants' Responses to Plaintiffs' Requests for Admissions, # 1 and # 1, P.Exh. 79.) During that same period defendant, Roj Electrotex, s.p.a. used the West 840 and West 1000 thread feeders at trade shows in

South Carolina. (Lehmann deposition at 22–24; P.Exh. 55.) During this period, and while selling West 840 and West 1000 thread feeders in South Carolina, Otex acted as Roj's agent in the United States pursuant to an Agency Agreement. (P.Exh. 27.) Roj referred to Otex as their agent. Roj set the prices Otex would charge. Roj personnel came on regular visits to South Carolina to assist Otex in maintenance of the thread feeders which Otex sold. Otex said in a letter to Roj that it wanted to remain an agent of Roj rather than a distributor until it determined whether the Roj unit (West 840 at that time) infringed any U.S. patents. (P.Exh. 28.) Otex alleges the agreement was changed in approximately February, 1976, so that Otex would purchase thread feeders from Roj and resell them in the U.S. There is, however, no evidence of record which establishes such a change.

I conclude that these facts make out a *prima facie* case of patent infringement against both defendants, which, unless refuted by the defendants, entitle the plaintiff Iro to relief on its patent claim.

### C. THE DEFENSE OF NON–INFRINGEMENT.

The plaintiffs allege that the defendants' West 840 and West 1000 thread feeders infringe claims 1, 9, 10, 11, 12, 28, and 39 of the Tannert patent. Claims 9 through 11 and Claim 28 are dependent claims, that is, they incorporate by reference earlier independent claims. Claim 1 is incorporated by reference into Claims 9, 11, 12, and 28. Claim 10 in turn incorporates by reference Claim 9.

For the defendants' devices to infringe the dependent claims, they must infringe the independent claims. This rule of law is clearly stated in *Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc.,* 362 F.Supp. 130, 164 (E.D.Va. 1973), *aff'd* 493 F.2d 1222 (4th Cir.1974):

35 U.S.C. § 112 provides that a claim may be written in independent or dependent form. If written in dependent form, it must be construed to include all limitations of the claim incorporated by reference into the dependent claim .... The

dependent claims are, therefore, limited to the same extent as the claims that they incorporate by reference. A dependent claim can be infringed only if the independent claim (which is incorporated by reference therein) is infringed. *Weatherhead v. Coupe,* 147 U.S. 322, 333, 13 S.Ct. 312, 316, 37 L.Ed. 188 (1893); *Dresser Industries, Inc. v. United States,* 432 F.2d 787, 792 n. 1 (Ct.Cl.1970); *Autogiro Company of America v. United States,* 384 F.2d 391, 408 (Ct.Cl.1967); *Application of Schutte,* 244 F.2d 323, 44 CCPA 922 (C.C.P.A.1957); *Cardiac Pacemakers, Inc. v. Coratomic, Incorporated,* 535 F.Supp. 280, 284 (D.Minn.1982); *Leesona Corporation v. Varta Batteries, Inc.,* 522 F.Supp. 1304, 1314 n. 23 (S.D.N.Y.1981).

Further, each of the independent claims, Claims 1 and 39, contains numerous elements in combination. These independent claims are infringed only if the defendants' device contains each of these elements or its substantial equivalent. To state the converse of this proposition, the defendants can demonstrate non-infringement by showing that their device does not contain the substantial equivalent of any one element of each of the two independent claims. *Deepsouth Packing Company v. Laitram Corporation,* 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed. 273 (1972); *Weatherhead v. Coupe,* 147 U.S. 322, 333, 13 S.Ct. 312, 316, 37 L.Ed. 188 (1893); *Prouty v. Draper, Ruggles & Co.,* 41 U.S. (16 Pet.) 336, 10 L.Ed. 985 (1842); *Decca Limited v. United States,* 640 F.2d 1156, 1168 (Ct.Cl.1980); *Strumskis v. United States,* 474 F.2d 623, 628 (Ct.Cl. 1973), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973), *reh'g denied,* 414 U.S. 1147, 94 S.Ct. 902, 39 L.Ed.2d 103 (1974); *Morpul, Incorporated v. Glen Raven Knitting Mill, Inc.,* 357 F.2d 732, 734 (4th Cir.1966); *Marston v. J.C. Penney Co.,* 353 F.2d 976, 985 (4th Cir.1965), *cert. denied,* 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); *Power Curbers, Inc. v. E.D. Etnyre & Company,* 298 F.2d 484 (4th Cir.1962); *Welch v. General Motors Corporation,* 330 F.Supp. 80, 82 (E.D.Va.1970).

Relying on these principles, the defendants base their defense of non-infringement on contentions that their device contains

nothing substantially equivalent to three elements in Claims 1 and 39, limitations C and D of Claim 1 and limitation E of Claim 39. These limitations are as follows:

1) A thread feeder adapted to be interposed between a supply source and a textile machine in which the thread feeder is adapted to accumulate at least several coils of thread for storage purposes axially along a winding body, said coils of thread forming a store of coils, the thread feeder being constructed to add coils at one end of the store from the supply source and the textile machine adapted to strip coils from the second end of the store, the thread feeder adapted to have the coils shifted in the direction from the one end of the store to the second end thereof, said thread feeder comprising:

C. a rotating thread laying guide mounted on said support for rotation coaxially with the axis of the winding body,

 i. the thread adapted to be fed from the supply source to said thread-laying guide,

 ii. said thread-laying guide being located to lay a coil of thread onto said winding body at a location constituting the beginning and one end of said store,

 iii. said location remaining fixed at all times during operation of said thread feeder,

D. means for axially shifting said coils in a direction away from said location while said thread-laying guide is rotating to form said store,

 i. the coil furthest from said location comprising the second end of said store,

 ii. the number of coils in the store and hence the position of said second end being variable.

39) In a thread feeder for feeding thread from a supply source to a textile machine and which includes a support, a winding body carried on said support, means for winding a plurality of coils on said winding body to form a store of axially arranged side by side coils connected between the supply source and the textile machine, means for progressively shifting the coils of said store from one end thereof to the second end thereof, the coils at the second end adapted to be freely stripped off said second end in the direction that the coils are being shifted, the invention herein comprising:

E. bead-like means for guiding the thread being stripped off said second end of the store to pass through said passageway in a direction opposite the direction in which the coils are shifted and thereafter to pass to said textile machine.

Having reviewed the claims made out in the patent, the testimony of the competing expert witnesses, the documentary exhibits to which the parties have referred, and the relevant law on the question, I find the defendants' argument unpersuasive.

 It is a basic principle of patent law that the claims of a patent define the patentee's invention. *Graver Tank and Manufacturing Company v. Linde Air Products Company,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Smith v. Snow,* 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1934); *Continental Paper Bag Company v. Eastern Paper Bag Company,* 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908); *Technitrol, Incorporated v. Control Data Corporation,* 550 F.2d 992, 998 (4th Cir.), *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 79 (1977); *Richen-Gemco, Incorporated v. Heltra, Incorporated,* 540 F.2d 1235, 1239 (4th Cir.1976); *Duplan Corporation v. Deering Milliken, Inc.,* 370 F.Supp. 769 (D.S.C.1973); *Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc.,* 362 F.Supp. 130 (E.D.Va.1973); *Maschinenfabrik Rieter A.G. v. Greenwood Mills,* 340 F.Supp. 1103 (D.S.C.1972).

 The Patent Code requires that the patentee, in his specifications, disclose structural and operational information which will support the language of the claims and will illustrate the application of the invention, 35 U.S.C. § 112; *Application of Cescon,* 474 F.2d 1331, 1335 (Cust. &

Pat.App.1973). The Code and the cases require only that the specifications disclose a single application of the claimed invention. The language of the claims, not the language of the supporting specifications, defines the invention, and includes all applications within the scope of the claims. The specifications are not limitations, and the invention is not limited or restricted to the language of the specifications. As Judge Learned Hand said on this question:

A claim must of course read upon the specifications, but the specifications unless so declared, are only an example of what the claim is intended to cover; it is a species of a broader genus, else no claims would cover anything not literally described in the specifications.

*Reiner v. I. Leon Company,* 285 F.2d 501, 504 (2d Cir.1960). Along the same lines, the Supreme Court in *Continental Paper Bag Co., supra,* wrote:

An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so most patents would be of little worth. "The principle of the invention is a unit, and invariable; the modes of its embodiment in the concrete invention may be numerous and in appearance very different from each other." 2 Robinson, Patents, § 485. The invention, of course, must be described and the mode of putting it to practical use, but the claims measure the invention. 210 U.S. at 418–19, 28 S.Ct. at 751.

*Smith v. Snow, supra,* 294 U.S. at 11, 16, 55 S.Ct. at 283, 285; *CTS Corp. v. Piher International Corp.,* 527 F.2d 95, 100 (7th Cir. 1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976); *Application of Cescon, supra; Maxon v. Maxon Construction Co.,* 395 F.2d 330, 334–35 (6th Cir.1968); *King-Seeley Thermos Co. v. Tastee Freez Industries,* 357 F.2d 875 (7th Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966); *Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc.,* 350 F.2d 885 (5th Cir.1965); *Edward Valves, Inc. v. Cameron Iron Works, Inc.,* 286 F.2d 933, 944 (5th Cir.), *modified on other grounds,* 289 F.2d 355 (5th Cir.), *cert. denied,* 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34 (1961); *Deere & Co. v. International Harvester Co.,* 460 F.Supp. 523, 534 (S.D.Ill.1978), *rev'd on other grounds without opinion,* 618 F.2d 110 (7th Cir.1980); *Dart Industries, Inc. v. E.I. du Pont de Nemours & Co.,* 348 F.Supp. 1338, 1356 (N.D.Ill.1972), *rev'd on other grounds,* 489 F.2d 1359 (7th Cir.1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974) ("Having described his invention and shown its principle, a patentee is deemed to claim every form in which his invention may be copied"); *Maschinenfabrik Rieter A.G., supra,* 340 F.Supp. 1103; *Eversharp Inc. v. Fisher Pen Company, Inc.,* 204 F.Supp. 649, 672 (N.D.Ill.1961).

█ The patent holder had made out a claim of literal infringement, by showing that an accused device falls within the language of the claim. The defendants cannot defeat this contention of infringement by showing that its device represents an application of the patent different from that shown in the particular specifications and drawings of the patent. If the accused device falls within the language of the claims infringement is proven. *Smith v. Snow, supra,* 294 U.S. at 20, 55 S.Ct. at 287; *CTS Corp. v. Piher International Corp., supra; Reiner v. I. Leon Co., supra; Deere & Co. v. International Harvester Company, supra; Maschinenfabrik Rieter A.G., supra,* 340 F.Supp. at 1118–19 and cases cited therein; *see also Graver Tank, supra.*

Applying these principles of patent law to the defendants' claim of non-infringement, I find that the defense must fail. As discussed above, the plaintiffs have presented, through expert testimony and supporting exhibits, evidence showing that the defendants' West series thread feeder embodies every limitation of claims 1, 9, 10, 11, 12, 28 and 39 of the Tannert patent. (Chadwick testimony, Tr. 183–202.) In rebuttal, through the testimony of their expert, Dr. Amad Tayebi, the defendants have focused the Court's attention on limitations C and D of Claim 1 and limitation E of Claim 39. Reviewing Dr. Tayebi's testimony, however, I find that he did not testify that the West series thread feeder was outside the literal

language of these limitations. Dr. Tayebi explained that the actual structure and operation of certain parts of the West series feeder differed from their counterparts set forth in the specifications and drawings of the Tannert patent. (Testimony of Dr. Amad Tayebi, Tr. 386–95). After a careful review of this testimony, I find that the differences between the West series feeder and the construction set forth in the specifications and drawings of the Tannert patent do not take the West series feeder out of the claims of the Tannert patent.

With respect to limitations C and D of Claim 1 of the Tannert patent, Dr. Tayebi noted that the West thread feeders use an oscillating disc to move the thread coils along the yarn feeder, while the Tannert patent, as it is illustrated in the figures in the patent, relies on a tapered cone working in conjunction with the tension of the thread.

Referring to the language of the limitations, however, I find no mention of the tapered cone, a passive mechanism for moving the coils of thread, or of an active mechanism such as the defendants' oscillating disc. Limitation C indicates only that there will be a thread-laying guide which, while fixed in a coaxial, plane rotates around the winding body. This plane will define the beginning and one end of the thread store. Limitation D of Claim 1 indicates only that there will be "*means* for axially shifting said coils" [emphasis added] away from the thread-laying guide. There is nothing in either limitation which indicates that these means will be active or passive.

Because of this, I believe that this issue falls squarely within the rule enunciated by Judge Learned Hand in *Riener v. I. Leon Company, supra.* As in the instant case, Judge Hand confronted a defense of non-infringement in which the defendant contended that it had not infringed the patent because its device employed an embodiment of the patent from that used by the patentee. Dismissing this contention, the Court said:

It is also plain that its language reads, not only on the specification, but upon the defendant's "clamp." The distinction suggested that the "resilient integral extension" i.e., the springs, pulls instead of pushes, the members together as in the defendant's "clamp" is irrelevant. Claim three does not contain as an element either method, and covers both. 285 F.2d at 504.

In the same way, I find that Claim 1 of the Tannert patent covers both passive and active means for moving the coils of thread along the winding body. The defendants use an active means, an oscillating disc, as opposed to the passive means illustrated in the drawings in the Tannert patent. This does not take them out of the coverage of the patent claim. In terms of the patent, this change is inconsequential.

I note also that in his deposition, Mr. Edward Lehmann acknowledged that the oscillating disc came within the literal terms of the limitations of Claim 1 (see Lehmann deposition, P.Exh. 55 at 62–69, 76), and this admission is not directly contradicted or overcome by the testimony of Dr. Tayebi (Tr. 386–90).

Limitation E of claim 39 calls for a bead-like mechanism to guide the thread from the second end of the store into the passageway and to the textile machine. In his testimony, Mr. Chadwick testified that the West thread feeder does have a bead-like mechanism and thus comes within the terms of the claim. (Chadwick testimony, Tr. 202.)

The defendants stress the fact that on the West 100 thread feeder, the collar, as they label the element, does not have a raised edge as is shown in the Tannert device as illustrated in the patent (P.Exh. 1). Therefore, the collar on the West series feeders does not perform the thread-lifting function which Mr. Chadwick attributed to the bead-like means on the Tannert device. (Tayebi testimony, Tr. 390–94). The language of the claim however, makes no mention of a thread-lifting function, nor does it indicate that the bead-like mechanism must be raised in the manner illustrated in the

Tannert patent. The precise configuration of the mechanism is unspecified, and the single required function this mechanism is to control is to guide the thread. As Mr. Chadwick testified, although the structures are somewhat different, the "collar" of the West series thread feeder and the raised rim of the Tannert illustrations produce the same result. (Chadwick testimony, Tr. 202.) Mr. Lehmann acknowledged that the collar performed this function. (Lehmann deposition, Pltfs' Exh. 55 at 69, 70, 72.) In his testimony, Dr. Tayebi does not specifically refute that this structure falls within the scope of this limitation. (Tayebi testimony, Tr. 390–94.)

In their briefs, the defendants stress a second function performed by the collar of the West series thread feeders: that it secures the rods which form the winding body of the feeder. This it does. This does not alter the fact that the collar also performs the specific function of the bead-like mechanism of the Tannert claim, and the fact that it has some auxiliary function does not take it out of that claim. As the Supreme Court noted in *Graver Tank and Manufacturing Company, supra,* it is a "dull and very rare type of infringement" in which the patented device is duplicated exactly. 339 U.S. at 607, 70 S.Ct. at 856. The defendants' device falls within the scope of the claims of the Tannert patent, and any differences between the defendants' device and the illustrations of the Tannert patent notwithstanding, it infringes that patent.

The defendants stress the fact that the oscillating disc and the collar found on the West series thread feeders are also found on prior art. That this is so does not make out a defense of non-infringement. In the Tannert patent, there is no claim that the tapered winding body or the raised edge are novel or unique devices. The singular warrant for the patent is that the various elements occur in a combination in which there is a novel invention. It is this novel combination that is claimed by the patent and entitled to protection from infringement. *Deepsouth Packing Company v. Laitram Corp., supra; Prouty v. Ruggles, supra.*

I have examined the various cases which the defendants cite, and find that they are inapposite to this factual situation. In *Stewart-Warner Corp. v. Lone Star Gas Company,* 195 F.2d 645 (5th Cir.1952); *Nash Motor Company v. Swan Carburetor Company,* 105 F.2d 305 (4th Cir.1939); and *Specialty Equipment and Machinery Corporation v. Zell Motor Car Company,* 113 F.Supp. 161 (D.Md.1953), the reviewing court in each case found that the patent did not cover the accused device. In this case, the patent covers the defendants' device. In *Morpul, Inc. v. Glen Raven Knitting Mill, Inc.,* 357 F.2d 732 (4th Cir.1966); and *General Plywood Corporation v. Georgia-Pacific Corp.,* 362 F.Supp. 700 (S.D.Ga.1973), *aff'd,* 504 F.2d 515 (5th Cir.1974), the court in each case found in prosecuting the application for his patent, the patentee had specifically claimed only narrow limitations for his patent, foregoing broad readings of the claims. In subsequent litigation, each patentee sought to revive the expansive claims foregone in securing the patent, and the court ruled in each case that the patentee was estopped from reviving these expansive readings of his claims. These rulings rest on the doctrine of file wrapper estoppel. In the instant case, I have found no indication that there was any file wrapper estoppel, any narrowing of claims in the pursuit of the patent which would now restrict the patentee to an especially narrow reading of the claims of the Tannert patent, and the defendants have not cited any clear evidence that there was file wrapper estoppel. Accordingly, these cases are inapplicable.

Thus, I find that the defendants have not shown that the West series feeders fall beyond the scope of the claims of the Tannert patent, and therefore infringement is established.

### III.

### DEFENDANTS' ANTITRUST COUNTERCLAIM

By their Amended Answer, defendants have charged that plaintiff Iro has, in conspiracy with Wesco, committed various vio-

lations of sections 1 and 2 of the Sherman Antitrust Act. 15 U.S.C. §§ 1 and 2. Thereafter Wesco was joined in this action as an involuntary plaintiff.

In evaluating the antitrust contentions, the facts are determinative. In the briefs, each side has cited numerous cases, but the applicability or inapplicability of this case authority depends on the facts of each case taken as a whole. Because of this, I undertake an extended discussion of the facts of this case as they bear on the various contentions the defendants have advanced.

## A. AB IRO'S ACQUISITION OF THE TANNERT PATENT.

■ The underlying litigation in this case is Iro's suit against the defendants to enjoin their alleged infringement of the Tannert patent, U.S. Patent No. 3,796,386. Iro acquired that patent from the original inventor, Karl Tannert, in 1977. (*See* Contract between Mr. Karl Tannert and Ab Iro, Ab Iro, March 14/16, 1977; D.Exh. 18). Defendants allege that Iro had an illicit predatory motive in acquiring this patent and that the acquisition was part of the Iro/Wesco conspiracy to destroy defendants.

I find that the evidence does not support this claim. Iro initially acquired a non-exclusive license in 1973. Under this license, Iro did not have the right to bring suits in its own name to enjoin infringement. (*See* Agreement between the company Ab Iro and Mr. Karl Tannert, May 30—June 8, 1973; D.Exh. 16). This was over two full years before defendants first entered the yarn-feeder market. Iro expended resources developing and marketing its IWF yarn feeder, and paid royalties to Tannert under the licensing agreement. (Hermann testimony, Tr. 651–54).

Under these circumstances, Iro was left with two options: seek release from its license with Tannert, looking to continue developing its yarn feeders free from royalty obligations; or enjoin Roj's patent infringement. Because it could not bring suit in its own name, Iro negotiated with both Tannert and Wesco, seeking to have a suit brought. Wesco indicated that it was willing to bring the suit and Iro initially offered to cover the cost of a patent enforcement action.[2]

Eventually Iro concluded that its interests required that it acquire the right to bring suit in its own name. The evidence does not disclose whether Iro reached this conclusion before or after October 8, 1976, when Karl Tannert offered to sell the Tannert patent to either Wesco or Iro. (Letter of Karl Tannert, Oct. 8, 1976, doc. 4 to Defendants' Memorandum in Opposition to Wesco's Motion for Summary Judgment). Given this letter, Wesco was aware of the possibility that Iro might purchase the rights to the Tannert patent. Further, on February 23 and 28, 1977, Mr. Sven Uddenburg of Iro sent Mr. Geiger of Wesco telex messages (Feb. 23, 1977, Uddenberg to Geiger, telex message, Feb. 23, 1977 docs. 10 and 11 respectively, Defendants' Memorandum in Opposition to Motion for Summary Judgment). These telex messages, particularly that of February 23, suggest that Iro was contemplating litigation independent of Wesco. The language of the message is, however, somewhat ambiguous, and it does not compel this reading.[3] Even giving these messages, the reading most favorable to defendants' position, the greatest involvement in Iro's acquisition of the Tannert patent which can be attributed to Wesco is that Wesco may have been able to infer that Iro was acquiring the Tannert patent.[4] There is absolutely no evidence

---

**2.** The Court specifically does not address the question whether a suit brought under these terms would violate any antitrust laws. The suit was not brought under these terms, and any questions relative to them are therefore moot.

**3.** The telex of February 23 reads in pertinent part: "Before we start litigation against Roj we

must have a binding confirmation that you will fulfill the conditions of your exclusive license for at least a certain period of time."

**4.** And *cf.* Kinkeldey testimony, Tr. 638 (Iro did not consult with Wesco concerning its acquisition of the Tannert patent); Geiger testimony, Tr. 679 (Q [by counsel for Wesco]: Did Wesco play any part in the acquisition of the Tannert

that Wesco played any role in this acquisition.

Considering all of the evidence, I find, first, that plaintiff Iro had a legitimate and non-predatory purpose in seeking the Tannert patent in 1977; and, second, that Wesco played no role in Iro's acquisition of this patent.

### B. AB IRO/WESCO'S ALLEGED REFUSAL TO GRANT LICENSES.

Defendants contend with great vigor, that the plaintiffs have individually and collectively refused to grant licenses under the Tannert patent to defendants. I find that the record does not support this allegation.

Dr. Hermann Kinkeldey, a patent attorney from the Federal Republic of Germany, testified concerning what I discern to be the normal course of conduct followed in disputes of this sort. He testified that the normal course of conduct is that the patent holder believing there is infringement contacts the alleged infringer, announces that it holds the patent, and requests that the infringer cease its offensive activity. The alleged infringer may then choose among three courses of action: it may cease its offensive activity; it may seek a license from the patent holder; or it may, by continuing its infringing activity and, making no response to the patent holder's request, indicate that it intends to contest the claim of infringement and/or the validity of the patent. (Kinkeldey testimony, Tr. 636, 653, 658–59, 663–64). The defendants have not

contended that this is not the normal course of dealing in patent infringement contests, nor have they offered evidence suggesting a different course was followed in this case; nor have they suggested that, as sophisticated and experienced business people advised by counsel, they did not understand that this was the course of conduct which they faced.

Dr. Kinkeldey testified that before this action was filed, he, as patent counsel for Iro, contacted Roj and advised Roj that the marketing of the West Feeder was an infringement of the Tannert patent. Roj never responded. (Kinkeldey testimony, T. 653–54). Dr. Kinkeldey testified further that after the suit was filed, Mr. Uddenburg, Iro's general manager, telephoned Roj to discuss the possibility of settling the suit on the basis of a license. Roj refused to discuss any license under which it would pay royalties.[5] (Kinkeldey testimony, Tr. 651–52)

In like manner, officers of Wesco contacted officials of Otex, advised them that Wesco felt the West feeders which Otex was marketing infringed the Tannert patent, and asked them to desist. "(Lehmann testimony, Tr. 283; Geiger testimony, Tr. 691–93). Otex officials elected not to seek a license from Wesco (Lehmann testimony, Tr. 278079). Again, Otex does not contend that the course of conduct in the trade is other than as outlined above, or that they did not understand it to be so."

From this evidentiary record, I find that plaintiffs Iro and Wesco initiated con-

---

patent by Iro?. A: No, none. In fact, we didn't even learn of it until well after it was finalized, apparently.)

Even assuming *arguendo* that Wesco knew that Iro was acquiring the Tannert patent in February, 1977, knowledge without more does not make Wesco a conspirator in the acquisition of this patent. *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979); *Byrd v. Local Union No. 24, International Brotherhood of Electrical Workers,* 375 F.Supp. 545 (D.Md. 1974). Certainly where there is no participation by Wesco in Iro's acquisition, there can be no basis for finding that Wesco joined a conspiracy to acquire the patent.

**5.** In their brief, defendants suggest that this offer to license came so belatedly that it was

not an action taken in good faith. (Defendants' Reply Brief, at 6). I find this contention without merit. Roj's failure to respond to Dr. Kinkeldey's initial message indicated its election to contest Iro's position on the Tannert patent. Under these circumstances, I find nothing to suggest that Mr. Uddenburg's offer was anything less than a good faith offer to settle the controversy without litigation.

Defendants also suggest, though citing no authority, that to resolve this dispute by taking a license would have required that they join an illegal conspiracy in violation of the antitrust laws. (Defendants' Reply Brief, at 6.) I regard this suggestion as specious.

tacts by which they reasonably presented the possibility of granting licenses to the defendants, and in the normal course of conduct left defendants with the opinion of responding and the obligation to respond if they wished to avoid litigation. The defendants, by their failure to exercise these options, indicated that they were not interested in acquiring a license from Iro or Wesco, but preferred to litigate. Given these facts, I find the contention that the plaintiffs individually or collectively refused to grant a license to the defendants is without merit.[6]

## C. IRO BONA FIDE BELIEF IN THE VALIDITY OF THE TANNERT PATENT.

Much of defendants' argument on the antitrust counterclaim is premised on the contention that plaintiffs have known from the outset of this case that the Tannert patent is invalid. The defendants contend that Iro cannot be acting in good faith in bringing this suit because they earlier filed an opposition to Karl Tannert's application for a patent in Britain, which would have been the equivalent of the Tannert patent, U.S. Patent No. 3,796,386, D.Exh. 12. From the fact that Iro filed this opposition, defendants would have this Court infer that Iro does not believe that the Tannert patent is valid. (Defendants' Brief at 13–14). Officials for Iro explained that the initial filing of the opposition to the British patent was a tactical maneuver taken to enhance their bargaining position with Karl Tannert concerning license and patent rights. (Kinkeldey testimony, Tr. 633–34, 644–45). I find this explanation credible and reasonable. Further once this opposition was filed, even though it was subsequently withdrawn, British patent authorities were presumably on notice of the possible invalidity of the patent. Because the opposition was withdrawn, these questions were not litigated as completely as they might have been. The fact that the question was raised and subsequently resolved in favor of granting the patent however, suggests that the validity of the patent is an open-and-shut question.

■ Having heard and considered all of the evidence, I believe it is clear that reasonable minds can differ on this question. Persons of impeccable credentials have appeared for either side and pressed their respective positions vigorously. In considering the patent issues, I have found that question very closely drawn. Having reviewed the evidence, I find that Iro believed that the Tannert patent was valid. Plaintiff Iro consulted with American counsel concerning the Tannert patent before bringing this suit, and was advised that the patent was valid. (Kinkeldey testimony, Tr. 642–43, 660–61; opinion letter of Richard Lione, January 2, 1977, D.Exh. 59C). Further, the litigation which Iro has undertaken is a direct contest against the alleged infringer, in which they would expect from the outset that the validity of the patent would be fully contested. This is in contrast with cases in which parties asserting patents of questionable validity have carefully brought suits only against those whom they expected would compromise rather than undertake full-scale litigation. *See e.g., Automated Building Components, Inc. v. Trueline Truss Co.,* 318 F.Supp. 1252 (D.Ore.1970); *United States v. Krasnov,* 143 F.Supp. 184 (E.D.Pa.1956). Further, plaintiffs have never threatened suit against any customer of Roj or Otex, have never otherwise sought to enforce their patent except through this litigation. Defendants acknowledge there has been no such activity

---

6. In view of this finding, I do not address the question, whether, as patent holders the plaintiffs or either of them could refuse to grant Roj or Otex licenses under these patents. *Cf. E. Bement & Sons v. National Harrow Co.,* 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058 (1902) (agreement between patent holder and exclusive licensee that any other requests for licenses will be refused does not violate antitrust law); *United States v. Huck Manufacturing Company,* 227 F.Supp. 791, 804 (E.D.Mich. 1964) (patent holder has the right to refuse to grant licenses to prospective licensees); *United States v. E.I. Du Pont De Nemours & Co.,* 118 F.Supp. 41 (D.Del.1953); *Hercule Powder Co. v. Rohm & Haas Co.,* 66 F.Supp. 899 (D.Del. 1946).

(Lehmann testimony, Tr. 274, 279). Again, this contrasts with the tactics used by those seeking to assert patents of questionable validity while trying to avoid litigation which would actually test their patents. *See, e.g., Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.1952); *United States v. Krasnov, supra.*

After a thorough review of this record, I find that there is no basis for the contention that plaintiffs have not acted in good faith in bringing this suit. This conclusion is not affected by any finding adverse to plaintiffs as to the Tannert patent itself.

## D. DEFENDANTS' CONTENTION THAT WESCO SHOULD BE REGARDED AS IRO'S COMPETITOR FOR PURPOSES OF ANTITRUST ANALYSIS.

It is elementary to antitrust law that "horizontal" arrangements, arrangements between competitors, are treated differently from "vertical" arrangements, such as those between a producer and its distributor. The leading case illustrating this proposition is *United States v. General Electric Co.,* 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926). Therein the Supreme Court approved arrangements by which General Electric licensed Westinghouse to make, use, and sell electric lamps, with all retail prices and terms of sale fixed by G.E. Needless to say, such explicit price-fixing would have illegal *per se* under section 1 of the Sherman Act had it been between horizontal competitors. The arrangement was permissible because the relationship was vertical: Westinghouse was a licensee under G.E. patents.

■ In this case, defendants argue that Wesco would compete with Iro but for the alleged conspiracy into which they have entered to destroy Roj and Otex. I find this contention unwarranted. The single fact which supports the idea that Wesco would compete with Iro is that Wesco at one time spent more than $500,000 trying to develop a yarn feeder. (Geiger testimony, Tr. 677–78). This fact alone does not make Wesco a competitor with Iro. Wesco was able to

market a few of its own yarn feeders, (Geiger testimony, Tr. 708), but it was unable to enter this market as a viable producer. The evidence shows that Wesco became and remains Iro's distributor independent of any considerations concerning Roj and Otex. There is no evidence suggesting that any conspiracy played any part in Wesco's decision to become Iro's distributor.

## E. DEFENDANTS' CONTENTION THAT WESCO MADE PAYMENTS TO IRO TO SUPPORT THIS LITIGATION.

■ In this case, the attorneys for all parties have pressed their various positions forcefully. The case is highly technical, and I express admiration and appreciation for the manner in which these complex matters have been presented so as to educate the Court on matters which are certainly beyond its prior knowledge.

At times, however, the attorneys have allowed their fervor to oversway their objectivity. A certain contentiousness is tolerable, but truth sets an outer limit to the scope of adversarial license. I believe that on one matter, the defendants have unfortunately, overstepped that limit. In their brief, the defendants assert:

> Moreover the terms of a proposed written agreement (D–19), . . . included an obligation on the part of Wesco to pay IRO approximately eighty five thousand dollars ($85,000.00) ostensibly as minimum royalties but obviously to defray the costs of patent acquisition and the bringing of this suit. Wesco admitted that they made this payment.
>
> Defendants' Brief, at 14–15

There is no citation to the trial record or to evidentiary materials other than the proposed agreement, an agreement which, as defendants concede, was never consummated. In its Reply Brief, plaintiff Wesco strongly protested that these allegations were false. Supporting its position with numerous citations to the evidentiary record, it noted that the $85,000 payment was a royalty payment which Wesco owed to the

owner of the Tannert patent under the Wesco-Tannert agreement of 1974. Wesco paid Iro only because Iro had acquired the Tannert patent in 1977. Wesco made these royalty payments to retain its exclusive licensing rights under the Wesco-Tannert agreement. Wesco dismissed defendants' contention that the payment was in support of this litigation as unsupported. (Post-Trial Reply Brief of Wesco, 67).

In their Reply Brief, defendants reiterated their contentions:

> The conspiracy herein is made even more aggravated than in *Singer United States v. Singer Mfr. Co.* [374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823] by the fact that Wesco conspired and contributed by payments to IRO in its litigation costs. . . . . (Defendants' Opposition to Summary Judgment Motion, documents 10, 11 and Geigier, pp. 705–07).

I have carefully examined Defendants' Exhibit 19, the two documents cited in defendants' reply brief, and Mr. Geiger's testimony. Defendants' Exhibit 19 contains the Registered Letter of Jan-Ake Johannesson, August 30, 1977, to which were attached the two draft agreements which Wesco officials had signed and submitted to Iro, but had then withdrawn.

The primary agreement, concerning a patent infringement suit to be brought against Roj, reads, at page 4, paragraph numbered 6:

> All expenses incurred in prosecuting the infringement action or actions pursuant to this Agreement shall be borne by Iro, except that Wesco shall pay the expenses of its own counsel's participation in any such action. In this connection, all arrangements entered into with lawyers and others involved in prosecuting said infringement action shall clearly provide that all payments to be made in connection with said action shall be Iro's sole

responsibility. In the event such action or actions result in an award of attorney's fees or other penalties against Wesco, Iro shall pay such award as a part of the expenses of the litigation. Iro hereby indemnifies Wesco against all awards, damages, or any other charges or penalties which may be assessed against Wesco as a result of any infringement action instituted pursuant to this Agreement.

Under the agreement Wesco does not assume any financial obligation towards Iro.

The other draft agreement attached to the Uddenburg letter, also signed by Geiger for Wesco, and also subsequently withdrawn, is a Second Amendment to the original Wesco-Tannert agreement of July, 1974. It recites initially that Tannert and Wesco entered into the original agreement, that the agreement was amended in 1975, that Iro has now acquired all of the rights earlier held by Tannert, and that the present amendment will modify the original Wesco-Tannert agreement. By this draft, Wesco would have agreed not to convert from an exclusive to a non-exclusive license. Because of this, Wesco would remain obligated to make minimum royalty payments. The second paragraph of the draft amendment recites the basis for computation of the minimum royalty payments.

This amendment declared a commitment by Wesco not to exercise its right to convert from an exclusive to a non-exclusive license.[7] The minimum royalty payments were established under the original Wesco-Tannert agreement, and are not created or charged by this agreement. There is nothing in the draft amendment even suggesting that the payments were in support of the litigation.

Wesco's obligation to make minimum royalty payments continued absent the conversion of its license to a non-exclusive license.

---

7. The first substantive paragraph of the amendment states:

> Wesco agrees that it shall not exercise its right under paragraphs 5.(a) and 5.(b) of the agreement of July 5, 1974, as first amended, to convert its exclusive license to a non-exclusive license on the third anniversary (July 5, 1977)

and on November 1, 1977, whereby Wesco shall be obligated to pay minimum royalties for the calendar years 1977 and 1978 in the manner defined in paragraphs 4.(a) and 4.(b), respectively, of the agreement of July 5, 1974, as first amended.

466

Wesco did not convert its license, though they remained free to do so at all times. Documents 10 and 11 to Defendants' Opposition are the telex messages of February 22 and February 28, 1977. They are barren of any suggestion that Wesco was to make payments to support this litigation. The testimony of Mr. Geiger does mention the $85,000 payment, but both the questions by defense counsel and Mr. Geiger's answers show unquestionably that these payments were royalty payments which Wesco was obligated to make under the original Wesco-Tannert licensing agreement.

Given this evidence, can it be reasonably said that the payments made by Wesco were "obviously to defray the costs of patent acquisition and the bringing of this suit?" If there is any evidence to support this contention, I am at a loss to discover it. Indeed, this contention is at odds with Iro's acknowledged and consistently documented position that it would fund this litigation.

Having considered this matter, I find no basis for the defendants' assertions that Wesco made payments to support this litigation. I am compelled by the record to agree with plaintiff Wesco that this contention is unsupported.

F. DEFENDANTS' CLAIM THAT PLAINTIFFS HAVE VIOLATED SECTION 1 OF THE SHERMAN ANTITRUST ACT.

The primary thrust of the defendants' antitrust counterclaim is that the plaintiffs have brought this suit pursuant to an agreement to use the Tannert patent as a vehicle for driving Roj and Otex from the yarn-feeder market. They contend that plaintiffs' agreement to force them from the market violates section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

In order to make out a violation of section 1 of the Sherman Act, the defendants must show that there was an agreement involving a plurality of actors. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). This agreement must be one to achieve illegal ends or to achieve its end through illegal means. *American Tobacco Company v. United States,* 328 U.S. 781, 791, 66 S.Ct. 1125, 1130, 90 L.Ed. 1575 (1945). While the defendants are not required to show an express agreement between the plaintiffs, *United States v. General Motors Corporation,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the defendants must produce evidence which shows that the plaintiffs came to a meeting of the minds. *Windsor Theatre Company v. Walbrook Amusement Co.,* 94 F.Supp. 388 (D.Md.1950), *aff'd,* 189 F.2d 797 (4th Cir. 1951). If there is no meeting of the minds—or if the resultant agreement is one which would achieve only legally permissible ends through legally permissible means—then there is no violation of section 1, and the plaintiffs are free to act as they will.

Attempting to show an agreement between plaintiffs, the defendants rely primarily on the draft agreement of July, 1977, under which Wesco promised Iro that there would be no license granted to Roj or its distributors. (Defendants' Exhibit 19). While this document is not without probative significance, it shows no combination for the simple reason that it was never consummated. The plaintiffs negotiated the agreement; Wesco prepared the draft and signed it; but Wesco then withdrew the draft before Iro officials could sign it. Defendants' Exhibit 19 contains a copy of this agreement, showing only the signatures of the Wesco representative. The cover letter, from Jan-Ake Johannesson to Robert Geiger aptly describes this agreement: "Proposed ... signed by you on behalf of Wesco ... but not thereafter consummated."

Defendants argue that while this formal document was not signed, there was a *"de facto"* agreement between the plaintiffs, under which Iro and Wesco adhered to all of the terms of the July, 1977 pact despite Wesco's withdrawal. (Defendants' Brief, at 15). A determination of whether or not there was a *"de facto* agreement" along the lines of the proposed agreement between Iro and Wesco requires a review of the

various documents which passed between plaintiffs.

The earliest document which defendants contend is relevant to this issue is a telex from Sven Uddenburg of Iro to Paul Kashden of Wesco, dated August 19, 1976. (Defendants' Memorandum in Opposition to Summary Judgment, Document 2). This message indicates that at this time, Iro wanted litigation brought against Roj and was negotiating to have Wesco bring a suit. In the first Paragraph of the message, Uddenburg recites the various agreements signed by the two parties, and states that Wesco has now been given the U.S. Distributorship for Iro products. The second and third paragraphs which the defendants regard as particularly significant, read:

In my opinion we have thus given you more than was originally agreed to be given by us in return for our right to go after Roy [sic] Electrotex by means of the Tannert patent.

I therefore now ask you to confirm by telex that we now have this right.

While this telex lends support to the contention that there was some connection between Wesco's acquisition of the Iro distributorship and Iro's suit against the defendants, it does not show that there was a meeting of the minds concerning the bringing of a suit. Certainly, there is no suggestion of Wesco guaranteeing that it would not grant sublicenses. Any suggestion that there was an agreement at this time is destroyed by subsequent events. In March of 1977, Iro bought the rights to the Tannert patent, acquiring the right to sue in its own name. It thereafter did not need Wesco's permission to pursue the defendants had there been an agreement even along the lines suggested by the August 19 telex, Iro's purchase of the Tannert patent would have been a pointless and unnecessary expense. This leads me to the conclusion that there was no agreement between the plaintiffs at this time.

The next document which defendants cite is a letter from Sven Uddenburg, dated April 1, 1977 to Norman Cook. (Defendants' Memorandum in Opposition to Summary Judgment, Document 12). By this time, Iro had acquired the rights to the Tannert patent, and the Torrington Company had acquired or was acquiring Wesco. The letter discusses a number of problems arising from Torrington's entry into the Iro-Wesco relationship. Defendants emphasize certain material at page 2 of the letter. I find that this material is significant, because it characterizes this litigation along the lines Iro has represented it to this Court: this is a patent infringement litigation, brought against Roj (and Otex) to stop their infringement of the Tannert patent. I note that in their briefs, defendants contended that there was no evidence that patent infringement was the actual reason for this case. (Defendants' Reply Brief, 7–8, 10–11; *see also* Defendants' Proposed Order, Findings of Fact, ¶ 47, p. 25; Conclusion of Law ¶ 11, p. 30):

At negotiations with Bob Geiger regarding the possibility of stopping Roj Electronics' sales in USA due to patent-infringement, we were all the time of the the opinion that you had the rights to this patent, and that it was your intention to transfer the rights to Iro so that we could take legal actions against Roj. We also took it for granted that if we started these legal actions, it should not be possible to dissolve or even turn these patent-rights into a license for Roj Electronics. We therefore expected you to fulfill all eventual obligations in your agreement with Tannert. Correspondence as well as discussions with Bob Geiger reflects this understanding. Therefore, I have to stress that I am really surprised, perhaps even shocked over what I heard from you concerning your ideas on selling these rights to any of our existing or presumptive competitors. In order to avoid being completely eliminated, we have, however, meanwhile acquired the patent rights from Tannert, i.e. that Iro and not Tannert is the licensor in your corresponding license-agreement. In connection with this acquisition we took it for granted that you either would maintain the exclusive license-rights with a minimum license reimbursement to Tannert/Iro or

withdraw from the contract. A possible granting of an under-license to any of our competitors must under these circumstances be regarded by us as an unfriendly action from your side that cannot be accepted.

These two indications, a possible sale of the patent-rights and your request for selling Storage Feeders outside the territory, underline our suspicion that you seriously consider a liquidation of the Wesco-activities.

The defendants emphasize the comments at the end of the second quoted paragraph. Given the context in which they occur, however, I do not find them at all unusual. The Torrington Company's acquisition of Wesco forced a reassessment of the extant Iro-Wesco relationship, and for Iro to regard a possible sale of a license to the defendants as unacceptable is not surprising. The firm tone of Uddenburg's letter does not reflect agreement between Iro and Wesco. Rather, it suggests that relations between the two companies were at this point quite strained.

The next document, a letter from Uddenburg to Robert Geiger of April 14, 1977, (Defendants' Memorandum in Opposition to Summary Judgment, Document 13), reflects this same tone of strain and possible disagreement between the two companies. The statement "For me it is very hard to believe that our present cooperation will be satisfactory in case you sell a license to e.g. Roj Electronics," emphasized by defendants, seems little more than a statement of Iro's view of its own best interest. It was contemplating a patent infringement suit against Roj. It could hardly approve of Wesco licensing Roj's infringement. Had Wesco granted a license to Roj under these circumstances, Iro's franchises would hardly have been an unreasonable response.[8]

The next document cited by the defendants is the letter from Robert Geiger to Jan-Arta Anderson of June 16, 1977. (Defendants' Opposition to Summary Judgment, Document 16). This letter discusses various technical problems related to using IWF yarn-feeders in American installations. The language which the defendants find so telling is a single sentence in a paragraph dealing with the marketing of these yarn feeders. Defendants emphasize this sentence shows clearly the predatory nature of the plaintiffs' conduct but considered in its context, it is simply so ambiguous that it cannot be regarded as especially significant. "Stopping Roj-Electrotex will also help us." It can be viewed either as announcing an illicit purpose or relating to a completely legitimate suit to stop patent infringement. Absent some indication to the contrary, I believe that the Court should read it as reflecting a permissible rather than an illicit purpose.

Next, defendants cite the letter of July 22, 1977, from Hermann Kinkeldey to Henry Lerner. (Defendants' Memorandum in Opposition to Summary Judgment, Document 17). As with the earlier Uddenburg-to-Cook letter, this document reflects the fact that Iro was interested in bringing this suit to stop patent infringement:

The Wesco-Tannert agreement is not explicit on the question whether the licensee is entitled to sub-license a party that has been sued for infringement under Article 8.a(3) of the agreement. It appears to be doubtful whether it would be equitable for the licensee to jeopardize the licensor's chances of winning a lawsuit that the licensee previously has refused to join. I think that we can leave this question open for the moment. With Iro and Wesco being both desirous of closely cooperating on the US Market, I take it for granted that Wesco would consult with Iro before considering to sublicense Roj

Defendants' key contention is that Wesco agreed with Iro that it would not give Roj (or Otex) a license. Yet in this letter, Iro's German attorney and Wesco's attorney in New York left the question open rather than requiring an explicit agreement between the companies. That Dr. Kinkeldey

---

**8.** *Cf.* testimony of Robert Geiger, Tr. 694 (Wesco officials believed that Iro would have terminated Wesco as its distributor had Wesco licensed Roj).

also indicated that he would "take it for granted that Wesco consult with Iro before" granting a license to defendants indicates that he felt that Wesco understood that withholding a license under these circumstances was in Wesco's best interests. Thus, it appeared to Kinkeldey that there was no need for an express agreement whereby Wesco would forego their right to grant sublicenses: they would decline to grant a sublicense to Roj for their own interests, independent of an agreement with Iro.

The defendants next refer to a letter of August 3, 1977, from Henry Lerner to Dr. Kinkeldey, written in response to Dr. Kinkeldey's letter of July 22. (Defendants' Memorandum in Opposition to Summary Judgment, Document 18). In the first substantive paragraph of this letter, Mr. Lerner indicates that Wesco is aware of Iro's intention to sue Roj, and states that, given the non-consummation of the Iro/Wesco agreement (D. Exh. 19), whether Wesco wishes to have this litigation proceed is an academic question, but that Wesco does wish Iro success. The next paragraph reads:

> As we view the agreement, paragraph 9 grants Wesco the unqualified right during the life of this agreement to sublicense others. We would think, however, that Wesco would only exercise such right if it felt it to be in its own best interest and we do know that at the moment it is to Wesco's interest to maintain the best possible relations with Iro.

I do not believe that this letter can be read as expressing agreement by Wesco that it would not grant a license to Roj or Otex. Rather, I believe it is simply a statement of fact. Wesco was aware that Iro planned to sue Roj. It was aware of its own interests in a continuing favorable relationship with Iro. Wesco needed no unusual insight to realize that to grant a license to Roj or Otex under these circumstances would destroy the relationship with Iro.

Finally, defendants cite the letter of Dr. Kinkeldey to Iro, August 10, 1977, of which I find only a portion in the records of this case. (Defendants' Opposition to Summary Judgment, Document 19). The critical language of this letter is a sentence which reads: "Furthermore, I have the impression that at the moment no danger exists of Wesco granting Roj a license."

The Webster's Third New International Dictionary defines "impression" as (definition 7) "a usually indistinct or imprecise notion, remembrance, belief, or opinion." Defendants contend that Dr. Kinkeldey's letter of August 10, along with Mr. Lerner's letter to Kinkeldey of August 3, clearly show that there was an agreement between the two parties. (Defendants' Reply Brief at 2). While I would agree that at this point Iro's impression that Wesco would grant no license to Iro was sufficiently strong that Iro felt secure in bringing suit against Roj and Otex, I am not certain that there was an agreement between them. Dr. Kinkeldey did not report that Wesco had made any commitment that it would not grant a license to Roj. He did not indicate that Wesco had agreed to grant no license to Roj. He used the word "impression," and I am compelled to evaluate this document based on his use of that word. I believe that this document indicates a failure of the parties to come to a clear cut agreement on the question of possible license to Roj. It does not, as defendants contend, strongly evince the prior existence of an agreement.

■ Weighed against these documents is the testimony of the various persons involved. I approach this testimony with a certain healthy scepticism: the witnesses are involved in the controversy and are interested in the outcome. Giving due regard to this, I nevertheless, draw from a careful review of the testimony the same conclusion that I reached on considering the documentation: there was no specific agreement between Iro and Wesco whereby Wesco in fact joined in any conspiracy to refuse to grant a license to Roj or Otex during the pendency of this litigation.[9]

---

9. Kinkeldey test, 656–56, 662–63 (Wesco never agreed to forego its right to grant sublicenses);

In their briefs, defendants stress two facts as showing that plaintiffs violated the antitrust laws: Iro asked Wesco not to grant Roj a license under the Tannert patent during the pendency of this suit; Wesco has not granted Roj or Otex a license under the Tannert patent. From these two facts, defendants would have this Court conclude that Wesco agreed that it would withhold a license.

I find that this line of reasoning is unsound both factually and legally. As to the facts, as indicated above, this Court has heard uncontradicted testimony that the normal course of dealings in a patent infringement contest is that once the patent holder contacts the alleged infringer and announces the claim of infringement, the infringer has the option of selecting the course it wishes to pursue. For an infringer to do as Roj and Otex did in refusing to discuss licenses indicated that they preferred litigation to licensing. There is no suggestion in the record that the defendants did not understand the normal course of conduct, or that they thought that the normal course of conduct was otherwise. Thus, they realized that their course invited litigation, and they are hardly in a position to complain that this is what they got. On the factual record, this Court does not believe that the defendants can reasonably

suggest that either Wesco or Iro ever *refused* to grant them a license.

■ Additionally, legally, I find that this case falls into the area of "conscious parallelism." [10] As courts have often noted in cases alleging conspiracy, action of several parties may be the result of joint behavior pursuant to an agreement, or it may be the result of independent actions with no common agreement. Where plural parties maintain parallel courses, this parallelism is circumstantial evidence which may support a finding of agreement. It does not, however, compel such a finding. As the Supreme Court said in *Theatre Enterprises v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954):

> To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. [citations omitted]. But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely. [footnote omitted].

Geiger testimony, 680–91, 698–99 (Iro sought to restrict Wesco's licensing rights; to protect its own business interest, Wesco refused).

**10.** Defendants rely primarily on *United States v. Singer Manufacturing Company*, 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963), as the controlling authority. I find *Singer* distinguishable from the instant situation. In *Singer*, the actors who joined in a conspiracy, were competitors. As discussed in Part D, *supra*, Iro and Wesco are not competitors. In *Singer*, the Court found that there was a conspiracy among the parties. As I conclude infra, defendants have failed to prove the existence of a conspiracy.

Conspiratorial cross-licensing and patent pooling by one group of competitors attempting to exclude others go far beyond the limited monopoly that a valid patent affords. *See* A. Neale & D. Godyer, The Antitrust Laws of the U.S.A.: A Study of Competition Enforced By Law 300–02 (3d ed. 1980). The Supreme Court

unequivocally condemned an attempt to abuse patent rights in this way in *Singer*. The Court made clear, however, that its ruling did not preclude a patent holder from the legitimate enforcement of his rights under a patent: There is no claim . . . that it is illegal for one merely to acquire a patent in order to exclude his competitors; or that the owner of a lawfully acquired patent cannot use the patent laws to exclude all infringers of the patent, or that a licensee cannot lawfully acquire the covering patent in order better to enforce it or his own account, even when the patent dominates an industry in which the licensee is a dominant firm. 374 U.S. at 189, 83 S.Ct. at 1781.

This language is *dicta* in *Singer* in the sense that it did not address the actual facts therein. The language is however pertinent to the situation herein, whereas the specific holding of *Singer* resting on distinguishable facts, is inapposite to this case.

The leading modern case applying the ideas set forth in *Theatre Enterprises* is *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3rd Cir.1977) *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Therein, Chief Judge Seitz said:

> The law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference or rational, independent choice less attractive than that of concerted action. *Compare Interstate Circuit, Inc. v. United States,* 306 U.S. 208 [59 S.Ct. 467, 83 L.Ed. 610] (1939), with *First National Bank v. Cities Services Co.,* 391 U.S. 253, 274–88 [88 S.Ct. 1575, 1585–92, 20 L.Ed.2d 569] (1968). We recently articulated those circumstances in *Venzie Corp. v. United States Mineral Products, Co.,* 521 F.2d 1309 (3d Cir.1975):
>
> > "(1) a showing of acts by defendant in contradiction of their own economic interests . . . ; and
> >
> > "(2) satisfactory demonstration of a motivation to enter an agreement. . . ." *Id.* at 1314 (citation omitted).

561 F.2d at 446.

*Bogosian* has been widely cited and is the leading modern statement of this issue.[11]

I find one of the cases which the Court of Appeals relied on in *Bogosian, supra,* is particularly instructive with respect to the present situation. The factual situation in *Venzie Corporation v. United States Mineral Products Co.,* 521 F.2d 1309 (3rd Cir. 1975), is quite close to that in the instant case. Mineral Products manufactured a fire-proofing compound (DC/F), and used Armstrong as its exclusive licensee in the Philadelphia area. Plaintiff Venzie Corporation held a fireproofing contract which they found required the use of DC/F. Venzie approached Mineral Products seeking a license. Mineral Products refused to grant a license, and Venzie's other efforts to obtain DC/F proved unavailing. Eventually, Venzie had to withdraw from its contract, which was then awarded to Armstrong.

Venzie sued Mineral Products and Armstrong alleging a conspiracy to refuse to sell DC/F. As defendants do in the instant case, Venzie based its contentions on the fact that both Mineral Products and Armstrong refused to deal with Venzie.[12] Discussing the standard to be used to evaluate the significance of such circumstances, the court said there were "two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior (521 F.2d at 1314): action against the alleged conspirators from evidence of parallel business behavior" (521 F.2d at 1314): action against the alleged conspirator's own best economic interest, and moti-

---

**11.** *Ambook Enterprises v. Times Inc.,* 612 F.2d 604 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980); *De Jong Packing Co. v. U.S. Dep't of Agriculture,* 618 F.2d 1329 (9th Cir.1980), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980) (finding conspiracy); *Schoenkopf v. Brown & Williamson Tobacco Corporation,* 637 F.2d 205, 208 (3d Cir.1980); *Federal Prescription Service v. American Pharmaceutical Association,* 663 F.2d 253, 267 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 494 (5th Cir.1982) ("[I]nference of conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendant."); *Proctor v. State Farm Mutual Auto Ins. Co.,* 675 F.2d 308, 327 (D.C.Cir.1982), *cert. denied,*

—— U.S. ——, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); *Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd,* 513 F.Supp. 1100, 1172–76 (E.D.Pa.1981); *see also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke Liquors, Ltd.,* 416 F.2d 71, 84–85 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

**12.** In *Venzie Corporation v. United States Mineral Products Co.,* 521 F.2d 1309 (3d Cir.1975), the facts were more favorable to Venzie Corporation than are the facts for the defendants in the instant counterclaim: Venzie made several good faith offers to acquire a license on terms favorable to Mineral Products Corporation and Armstrong. By contrast, defendants herein refused to discuss any licensing agreement under which they would have to pay royalties.

vation to enter a conspiracy. The court continued, saying:

> The absence of action contrary to one's economic interests renders consciously parallel behavior "meaningless and in no way indicates agreement...." Turner, *The Definition of Agreement Under The Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 681 (1962).

521 F.2d at 1314.

■ The lesson of Dr. Turner's seminal article and of the conscious parallelism cases is clear: to make out a showing of conspiracy on their counterclaim, the defendants must do more than present a fact situation in which conspiracy might be inferred; they must present evidence which cannot be reconciled with a contrary innocent explanation. If the evidence, taken as a whole, is consistent with innocent nonconspiratorial behavior—even if it is also consistent with conspiracy then the defendants have not met their burden. L. Sullivan, Handbook of the Law of Antitrust 315–19 (1977). Behavior contrary to plaintiffs' economic interests would be, of course, irreconcilable with innocence. Reviewing the record, I find no evidence which is compatible with a theory of independent behavior.[13]

■ Evaluating the circumstances of this case, the testimony of the witnesses, and the various documents cited, I find that the defendants have failed to demonstrate the existence of a conspiracy. While some of the evidence is consistent with the idea that the plaintiffs conspired to destroy the defendants, there is a great deal of evidence which cannot be reconciled with the theory. Particularly the correspondence between officials at Iro and those at Wesco shows something far less than a meeting of the minds. By contrast, I find that virtually none of the evidence is inconsistent with a theory of independent parallel actions. Iro decided to bring this suit to try to stop what it believed to be infringement of a valid patent. Wesco, though deciding not to join in this litigation, found it in its independent best interest not to offer Roj or Otex a license. Though the results were parallel courses of action, I conclude, there was no conspiracy, and there was therefore no violation of section 1 of the Sherman Antitrust Act.[14]

## G. DEFENDANTS' CONTENTION THAT IRO HAD ATTEMPTED TO MONOPOLIZE THE YARN–FEEDER MARKET.

■ Defendants contend that Iro, by its bringing of this action, has attempted to drive Roj from the yarn-feeder market. Defendants argue that this is an attempt to monopolize that market, section 2 of the

---

**13.** I note that a comparable standard prevails in conspiracy cases outside the antitrust field. To show conspiracy, a party must produce evidence which is not only consistent with a theory of conspiracy, but evidence which is inconsistent with a theory of innocent behavior. *Rutledge v. Electric Hose and Rubber Company,* 327 F.Supp. 1267 (C.D.Cal.1971); *Fink v. Sheridan Bank of Lawton, Oklahoma,* 259 F.Supp. 899 (W.D.Okl.1966); *Seneca Falls Machine Company v. McBeth,* 246 F.Supp. 271 (W.D.Penn.1965), *vacated in part on other grounds,* 368 F.2d 915 (3d Cir.1965); *Johnson v. Branch,* 242 F.Supp. 721, 732 (E.D.N.C.1965), *rev'd and remanded on other grounds,* 364 F.2d 177 (4th Cir.1966), *cert. denied,* 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967) ("[W]hen proof establishes a factual situation which would just as well justify defendants' conduct as to lead to an inference of conspiracy, then plaintiff has failed to carry her burden.").

**14.** Even assuming *arguendo* that there was between Iro and Wesco some measure of agreement, Iro clearly never obtained a veto over possible future sublicenses. Where there is no control over licensing, coordination and cooperation in *bona fide* efforts to enforce patent rights against infringement are permissible under the antitrust law. *United States v. L.D. Caulk and Company,* 126 F.Supp. 693, 703 (D.Del.1954) ("Not only does this seem to be unobjectionable, but necessary and proper"); *see also Grantham v. McGraw-Edison Company,* 444 F.2d 210 (7th Cir.1971) (approving cooperative efforts by patent holder and licensee as necessary to protect patent rights); *United States v. E.I. Du Pont de Nemours and Company,* 118 F.Supp. 41, 229 (D.Del.1953), *affirmed,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see generally* A. Neale & D. Godyer, *supra,* at 288–96 (though scrutinizing arrangements closely, courts permit arrangements necessary to allow the patent holder the legitimate benefits of his invention).

Sherman Antitrust Act, 15 U.S.C. § 2. To make out an attempt to monopolize in violation of section 2, defendants must show that in the relevant market Iro had economic capacity which came dangerously close to monopoly power and had a specific intent to monopolize.[15]

■ I find that the relevant market in this case is the market for shuttleless weaving looms in the United States. In this market, the dominant firm is Sarfarti, which controlled some 50 to 60% of the market as of April, 1979, the last point for which market figures have been presented to the Court.[16] Iro controls approximately 10 to 20% of this same market, and the evidence shows its market share has declined since Roj introduced the West-series feeders.[17] These figures indicate that plaintiff Iro's economic power does not dangerously approach monopoly power in the relevant market.

In some courts, specific intent to monopolize has been read expansively to include "intent to indulge in means that are in some sense untoward," [18] and some cases have suggested that untoward practices may support a finding of attempt to monopolize even in the absence of dangerous probability of the actual monopolization.[19]

15. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Columbia Steel Company,* 334 U.S. 495, 532, 68 S.Ct. 1107, 1126, 92 L.Ed. 1533 (1948); *American Tobacco Company v. United States,* 328 U.S. 781, 785, 809, 814, 66 S.Ct. 1125, 1127, 1138, 1141, 90 L.Ed. 1575 (1946); *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *Swift & Company v. United States,* 196 U.S. 375, 396, 402, 25 S.Ct. 276, 279, 282, 49 L.Ed. 518 (1905) (Justice Holmes' seminal statement of the elements of attempt to monopolize); *White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *United States v. Empire Gas Corp.,* 537 F.2d 296 (8th Cir.), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Central Savings & Loan Association of Chariton, Iowa v. Federal Home Loan Bank Board,* 422 F.2d 504 (8th Cir.1970); *American Football League v. National Football League,* 323 F.2d 124 (4th Cir.1963); *United States v. Aluminum Company of America,* 148 F.2d 416, 432 (2d Cir.1945); *Kinnett Dairies, Inc. v. Dairymen, Inc.,* 512 F.Supp. 608, 641–42 (M.D.Ga.1981); *Joe Westbrook, Inc. v. Chrysler Corp.,* 419 F.Supp. 824, 844 (N.D.Ga.1976); *Bowl America Incorporated v. Fair Lanes Inc.,* 299 F.Supp. 1080, 1093–95 (D.Md.1969); *United States v. American Oil Company,* 249 F.Supp. 799, 808–09 (D.N.J.1966). As Professor Sullivan notes in his Handbook of the Law of Antitrust 134 (1977), through these two elements, specific intent and dangerous probability, make up the normal test of attempt to monopolize, "[y]et, the scope of the offense remains unclear, in part because it is usually charged conjunctively with monopolization, conspiracy to monopolize, or conspiracy in restraint of trade, and in the course of adjudication analytical focus is placed elsewhere, and in part because of conflicting attitudes about poli-

cy and the uses of economic concepts in antitrust adjudication."

The most comprehensive discussion of attempts to monopolize is Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two,* 72 Mich.L.Rev. 373 (1974).

16. Plaintiffs' Exhibit 61A, Deposition of William L. Lehmann, May 1, 1979, at 7–9, 14–15; Plaintiffs' Exhibit 64, Deposition of John L. Conn, II, April 23, 1979, at 86.

17. Plaintiffs' Exhibit 64, at 85–86.

18. Cooper, *supra* note 13, at 395.

19. *See, e.g., Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1219 (9th Cir.1977); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.1964); *Huron Valley Publishing Co. v. Booth Newspapers, Inc.,* 336 F.Supp. 659, 662 (E.D.Mich. 1927).

In *Ray v. United Family Life Insurance Company, Inc.,* 430 F.Supp. 1353 (W.D.N.C.1977), Judge McMillan endorsed this view, stating:

Although proof of the defendants' market power may be an alternative to direct evidence of intent to monopolize, it is not necessarily an *element* of an attempt to monopolize. A showing of anti-competitive acts accompanied by a specific intent to monopolize should be sufficient to make out a case of attempt. *See* P. Areeda, *Antitrust Analysis,* 241–49, 258 (2d Ed.1974). 430 F.Supp. at 1358 (emphasis in original).

In view of the Court of Appeals apparent adherence to the more traditional view that dangerous probability is a necessary element of attempt to monopolize, I am not certain that this could be described as the rule of this circuit. *See White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974).

I accept this more liberal standard here for purposes of discussion to make clear that even

What Iro has done by bringing this litigation is to assert its right to enforce its patent. Under that patent, Iro is granted a legal monopoly, a legal right to exclude others from the use of the invention embodied in the patent. For this Court to rule that the assertion of patent right is an attempt to monopolize would render the patent worthless. Indeed, because there were here and will be in almost any instance, costs in acquiring a patent, the result of such a ruling would be to make a patent a liability.

■ The defendants state in their Reply Brief that Iro had the right to develop yarn feeders under the Tannert patent under its original non-exclusive license.[20] The defendants argue from this fact that there was no legitimate purpose in Iro's acquisition of the Tannert patent itself or in the bringing of this litigation.[21] It is true that Iro, as a non-exclusive licensee, had the right to develop yarn feeders under the Tannert patent. As the inventor, however, Mr. Karl Tannert, or his successors to the patent had and has more than a right to develop a yarn feeder under this patent. The patent holder has the right to exclude all others from the development of this invention, or to admit them to the use of the patent under whatever licensing terms the patent holder wishes to impose.[22]

■ Courts are rightly careful to scrutinize assertions of patent rights to insure that these do not exceed the legitimate bounds of patent law.[23] Accordingly, I have carefully examined this record, and I find that in acting as it has, plaintiff Iro

has not gone beyond the legitimate rights accorded by the patent laws. Further, I believe that a contrary ruling, one which would find in a course of action such as this a violation of section 2 of the Sherman Antitrust Act, would so restrict the range of actions permitted to a patent holder that it would have an unworkable result.

Therefore, I conclude that on the record before this Court, defendants have failed to establish that the plaintiffs, by acquiring or asserting the Tannert patent, has attempted to monopolize in violation of section 2 of the Sherman Antitrust Act.

## IV.

## CONCLUSION

Based on the foregoing analysis, three general conclusions shape the result in this case: First, the Tannert patent is valid and nonobvious; second, the defendants' West series thread feeders infringe on the Tannert patent; third, the plaintiffs have not violated the antitrust laws in pursuing this action.

Accordingly, the plaintiffs are entitled to and are hereby granted a permanent injunction against the defendants prohibiting the further infringement of the Tannert patent, and an award of damages to be determined by an accounting. Judgment will be entered for the plaintiffs on the defendants' counterclaim.

The parties are directed to collaborate in the preparation of the accounting, and are to submit these materials to the Court thirty (30) days after the issuance of this Order.

under this standard, the defendants have not made the showing necessary to establish an attempt to monopolize.

**20.** Defendants' Reply Brief at 7; *see also* Defendants' Proposed Orders at 30.

**21.** Defendants' Brief at 14; Defendants' Reply Brief at 3, 7–8, 10–11; *see also* Defendants' Proposed Order at 25, 30, 31–33.

**22.** "The special feature of the patent is a right to exclude others from practicing the invention. . . .
"[E]very patent is a grant of monopoly power by the state and, as such, is necessarily im-

mune from the prohibitions of antitrust; for if it were a case of illegal monopolization to take out a patent, there would be no point in the patent system. . . . Not only the monopoly in the patented article, but also certain kinds of restrictive agreements made by the patent holder may be no more than a legitimate exercise of rights inseparable from the grant of the patent." A. Neale & D. Godyer, The Antitrust Laws of the U.S.A.: A Study of Competition Enforced by Law 288 (3d ed. 1980).

**23.** *See generally, id.* at 288–309.

When the parties reassemble for the presentation of the final accounting and the injunction, they may also make submissions and present argument concerning the questions of whether the defendants' conduct warrants either treble damages or the award of attorney fees. These questions are held in abeyance pending these submissions and argument.

IT IS SO ORDERED.

APPENDIX

As an aid to understanding the working of the various devices described in this opinion, I have attached drawings of the devices which figure most prominently in the discussion. The first six pages are a full set of drawings from the Tannert U.S. patent 3,796,386, plaintiffs' exhibit 1. Following this are technical drawings showing the Pfarrwaller, Pourtier, and Rosen devices, and the defendants' West device.

PATENTED MAR 12 1974

SHEET 1 OF 6

The Tannert Patent
3,796,386

476

The Tannert Patent
3,796,386

FIG. 3

FIG. 4

FIG. 5

477

The Tannert Patent
3,796,386

A2 FIG. 6

A2 FIG. 7

A2 FIG. 8

478

The Tannert Patent
3,796,386

FIG.9

FIG.10

FIG.11

*The Tannert Patent*
3,796,386

B2
FIG.12

B2
FIG.13

**480**

The Tannert Patent
3,796,386

A4
FIG.14

A5
FIG.15

Taken from Plaintiffs' Exhibit 4, this figure shows the Pfarrwaller device, U.S. patent 3,411,548. As shown in this figure, thread is taken from a bobbin (1), and passes through a rotating shaft (2). As rotating arm (3), then lays the thread onto a winding body (4). This winding body is mounted on the rotating shaft and is rotatable. It is held stationary through the action of devices such as an armature and magnet arrangement (5), or eccentric weights. The rotation of the thread-laying arm is controlled by a light source and light-sensing device (6 & 7).

This drawing, taken from Defendants' Exhibit 5, shows the Pourtier device, West German patent 1,191,197. For clarity of presentation, the feature numbers shown on the original drawing have been deleted and the features renumbered. In this device, wire is taken from a manufacturing machine, not shown. The wire travels from right to left in this drawing, as shown by the signal WT. The wire is taken up by a continuously rotating arm (1), and laid on a non-rotating drum (2) The coil store travels as shown by the signal CT. Wire is circumferentially lifted from the drum by a second rotating arm (3), passes over a guide (4), and through a shaft (5). The wire-lifting arm rotates intermittently, and this rotation is controlled by signal generated from two photo-electric cells (6 & 7), which are activated by an external light source (8).

This figure is taken from the Rosen U.S. patent 3,720,384, plaintiffs' exhibit 4, and is identical to figures in Rosen U.S. patent 3,796,384, defendants' exhibit 10. The device illustrated consists of a shaft (1), which is rotatably mounted on bearings. A winding body (2) is mounted rotatably on this shaft. The winding body is kept from rotating (or, so to speak, counter-rotated relative to the shaft) by a system of gear rings (3 & 4) and a pair of sprockets and a connecting pin (5 & 6). A rotating arm (7) lays coils of thread (T) onto the winding body. The coil store is moved along the winding body by the action of an inclined toothed disk (8), which does not rotate relative to the winding body, but is made to oscillate by the rotation of a mounting plate (9). As the coil store builds up, the frictional resistance overpowers the spring (10), causing the pin (11) to disengage and interrupting the laying of thread by the arm (7).

This figure, taken from defendants' exhibit 9 shows the defendants' West 1000 series device. Thread (T) passes through an outer hood, and is then laid on the cage-like winding body (1) by means of a rotating arm (2). The thread is moved positively

along the winding body by means of an oscillating disc (3), with the coil-store moving in the direction CT. The thread is then pulled over the end of the winding body and passes to the weaving machine.